**UNITED STATES**

v.

**Bobby FOSTER.**

**Crim. No. 81–427.**

United States District Court,
District of Columbia.

July 7, 1983.

Anita J. Stephens, Lisa J. Stark, Asst. U.S. Attys., Stanley S. Harris, U.S. Atty., Washington, D.C., for the Government.

Thomas Lumbard, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

Before the Court is the motion of defendant Bobby T. Foster (Foster) to vacate and set aside his conviction pursuant to 28 U.S.C. § 2255.[1] As grounds therefor, he asserts that (1) all the evidence used against him at trial was obtained in violation of the safeguards provided by the Fourth Amendment to the Constitution, and (2) the failure of his trial counsel to make a timely motion to suppress that evidence violated Foster's right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the Constitution.

---

1. 28 U.S.C. § 2255 provides in pertinent part:
   A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to

The government has opposed, urging that defendant's Fourth Amendment rights were not invaded and, accordingly it was not ineffective for trial counsel to decline to file a groundless motion to suppress.

To clarify the record, an evidentiary hearing was held on April 18, 1983, at which time further briefing was also requested from both sides. See § 2255 Rules 4(b) and 8(a).

Upon consideration of the memoranda submitted by the parties and the trial record as supplemented by the April 18 hearing, the Court finds that (1) Foster was illegally detained by a police official employed by the Washington Metropolitan Area Transit Authority ("WMATA" or "Metro"), and (2) the evidence seized on the night of defendant's arrest, a sawed-off shotgun, was a fruit of that illegal detention, which should have been suppressed. Thus, the failure of defendant's trial counsel to make a timely motion to suppress the shotgun constituted ineffective assistance of counsel in derogation of defendant's Sixth Amendment rights.

Foster's conviction and sentence must, therefore, be vacated and set aside.

## I. PROCEDURAL BACKGROUND

Foster was originally brought before this Court by reason of a three-count indictment filed on November 4, 1981. The indictment charged him with (1) possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d); (2) possession of a firearm after conviction of a felony, in violation of 18 U.S.C.App. § 1202(a)(1); and (3) possession of a prohibited weapon, in violation of 22 D.C.Code § 3214. The same firearm, a sawed-off shotgun, was involved in each count.

On January 18, 1982, Foster was convicted by a jury of Counts 1 and 2. Pursuant

impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

to his pretrial request, Foster was separately tried by the Court without a jury on the 3rd Count, the charge of possessing a firearm after having been convicted of a felony, and was also found guilty of this last offense. On February 19, 1982, defendant was sentenced to concurrent terms of two years' imprisonment on each count, to be served concurrently with any other sentence previously imposed.

With the benefit of new counsel, defendant appealed his conviction to the U.S. Court of Appeals for the District of Columbia Circuit, arguing *for the first time* that the WMATA police officer had no authority to stop him and seize the sawed-off shotgun. The government countered that, pursuant to Rules 12(b)(3) and 12(f) of the Federal Rules of Criminal Procedure, Foster waived his right to challenge the introduction of the shotgun because he did not raise any suppression issue in the trial court. On October 19, 1982, after having heard oral argument, the Court of Appeals affirmed the conviction by Order without opinion, thus, presumably adopting the position of the government.

Thereafter, Foster lodged his 2255 petition.

## II. FACTS

The record herein, as supplemented by the April 18 hearing,[2] reveals that there is no real dispute as to the material facts and circumstances surrounding Foster's arrest and the seizure of the sawed-off shotgun.

In the early morning hours of October 7, 1981, David S. McKenzie, a uniformed officer of the Metro Transit Police, was making routine rounds in his marked transit police scout car, patrolling bus routes and inspecting closed subway stations in his sector. (T.Tr. 4–5; H.Tr. 18)[3] At approximately 2 a.m., he finished checking the interior of the Smithsonian subway station and entered his patrol car, which was parked in a lot at 12th Street and Independence Avenue, S.W. (T.Tr. 5–6; H.Tr. 18) Leaving the lot, he turned southbound on 12th Street, and stopped for a red light at the Independence Avenue intersection. A vehicle suddenly came into view heading toward him on 12th Street. It made a sharp right hand turn at a high rate of speed and proceeded east on Independence Avenue. Officer McKenzie's curiosity was aroused, and he "fell in behind" the vehicle. (T.Tr. 6–7; H.Tr. 19–21)

As the suspicious car approached 9th Street, it slowed down, made an improper right turn from the center lane onto 9th Street, and suddenly stopped near the middle of the intersection. (T.Tr. 7, 62; H.Tr. 22) Officer McKenzie pulled up behind the other car and activated his vehicle's high beam headlights in order to see what, if anything, was going on inside the stopped car. (H.Tr. 23)

Foster, who was driving, was seen to duck down and move across the front seat as John Melby, the sole passenger, moved into the driver's seat. (H.Tr.7) Foster then left the car via the passenger door, crossed the sidewalk at the southwest corner of 9th Street and Independence Avenue, walked to a steam grate near the wall of a government building, and bent over the grate several times in a ducking motion, "spitting up." (T.Tr. 63; H.Tr. 7, 22–25)

As a result of what he observed, Officer McKenzie became suspicious that defendant was not a licensed driver. He radioed for assistance from the District of Columbia Metropolitan Police Department, (MPD) "since the area in question was under their jurisdiction." (T.Tr. 10; H.Tr. 23) He also activated the revolving red light atop his vehicle. (H.Tr. 23, 24) As McKenzie got out of his car, Foster returned from the steam grate, approached McKenzie and asked what was the matter. McKenzie returned the inquiry, and defendant stated

---

2. Bobby Foster did not testify at the trial, but he did testify at the April 18 hearing. His version of the material facts was not significantly different from that presented by the government at his trial.

3. "T.Tr." indicates a reference to the trial transcript taken on January 13–18, 1982, and "H.Tr." refers to the transcript of the April 18, 1983, hearing on the instant motion.

that he had to stop because he had become sick from drinking beer. (T.Tr. 10; H.Tr. 7–8, 25)

McKenzie then asked Foster for his driver's license. Foster replied that he did not have one. When McKenzie stated that he had seen Foster driving the car, Foster repeated that he did not drive and called to Melby, who was still sitting in the driver's seat, to show Officer McKenzie his (Melby's) permit. Melby did. (T.Tr. 11, 25, 63; H.Tr. 25–26)

McKenzie took Melby's permit, made a radio check of it, and asked for the vehicle registration. As McKenzie watched, Melby retrieved the registration from the glove compartment. McKenzie took the registration, examined it and ran a radio check. (T.Tr. 11; H.Tr. 7–8, 26–27) He did not return the license and registration, nor did he tell Melby and Foster they were free to leave. He was "stalling for time" in order to allow the MPD officers to arrive at the scene. (H.Tr. 26)

While McKenzie was investigating Melby's license and vehicle registration, Foster and Melby walked toward McKenzie, causing him to retreat behind the corner of his own car. (H.Tr. 27) McKenzie became nervous, fearing that the two were going to assault him. (H.Tr. 27) He withdrew his service revolver from its holster and held it at his side behind his leg. (H.Tr. 28) Melby did not realize that McKenzie had his weapon in his hand, but Foster became aware of this fact when he noticed the empty holster. (T.Tr. 11–14, 32–33; H.Tr. 13, 28)

At this point, Foster returned to his car, retrieved a sawed-off shotgun from under the passenger seat, and concealed it in his jacket. (H.Tr. 9) He then walked approximately 25 feet away to a grassy strip of ground next to the grate at which McKenzie had seen him earlier. Defendant dropped the weapon in the grass and returned to the vicinity of the two stopped vehicles. (H.Tr.29) McKenzie did not see the shotgun, but he did see Foster drop a long, dark object in the grass. *Id.*

As Foster returned to the point where the cars were stopped, MPD units arrived at the scene. (H.Tr. 9) McKenzie related his observations to Officer Thomas Blue. (T.Tr. 12, 14–15) As Officer Blue questioned Foster and Melby, McKenzie walked to the grate over which he had seen defendant bending. He inspected the grate with his flashlight and tried to open it in order to check the concrete areaway below. (T.Tr. 15–17; H.Tr. 30–31) He saw no residue of vomit, but as he turned away, the beam from his flashlight struck the sawed-off shotgun lying in the grass. *Id.*

McKenzie yelled his discovery to the MPD officers who thereupon took Foster and Melby into custody, handcuffing and formally arresting them. *Id.*

The shotgun was loaded with one 20-gauge shell. It was later determined that it measured only 18½ inches in overall length and that it was not registered in Foster's name, as required by 26 U.S.C. § 5841. (T.Tr. 54–56) It was test fired and found to be operative.

## III. DISCUSSION

### A. *Standards for Granting Relief Under § 2255*

■ Pursuant to 28 U.S.C. § 2255:

If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

Violations of specific constitutional rights that actually prejudice a defendant's case are clearly remediable under this section. *See Brown v. U.S.,* 656 F.2d 361 (8th Cir. 1981), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981); *United States v. Sturm,* 671 F.2d 749, 751 (3d Cir.1982), *cert.*

*denied,* —— U.S. ——, 103 S.Ct. 95, 74 L.Ed.2d 86 (1982). On the other hand, non-constitutional violations of federal law warrant relief only if they involve a "fundamental defect" causing a "complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979) (quoting *Hill v. U.S.,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)); *see United States v. Capua,* 656 F.2d 1033, 1037 (5th Cir.1981) (no relief under § 2255 for mere errors of law not resulting in miscarriage of justice).

Defendant here contends that all the Government's evidence respecting the sawed-off shotgun, especially the weapon itself, was obtained in violation of Foster's Fourth Amendment rights inasmuch as, "[s]aid evidence was obtained by reason of and as a direct result of an . . . investigative stop and arrest of Foster by an officer of the Metro Transit Police who had no legal authority to make such a seizure of Foster's person." Motion to Vacate at 2. Alternatively, Foster argues that his trial counsel's failure to make a timely motion in the trial court to suppress the evidence against him violated his Sixth Amendment right to effective assistance of counsel.

We look first, briefly, at the appropriate scope to be given Foster's 2255 petition at this point in the proceedings.

▮ Relying on *Kaufman v. U.S.,* 394 U.S. 217, 231, 89 S.Ct. 1068, 1076, 22 L.Ed.2d 227 (1969), defendant asserts that Fourth Amendment claims may properly be raised for the first time by a motion to vacate sentence under § 2255. The recent U.S. Supreme Court decision in *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), however, casts significant doubt on the continuing vitality of the rule announced in *Kaufman. See Norris v. U.S.,* 687 F.2d 899, 901 (7th Cir.1982); *United States ex rel. Spurlark v. Wolff,* 699 F.2d 354, 359 (7th Cir.1983).

In *Frady,* the Supreme Court emphasized the need for finality in criminal proceedings and held that the "cause and actual prejudice" standard of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977),

controls a court's consideration of claims in § 2255 proceedings where the issue raised by the 2255 petition was not pressed at trial through a procedural default on the part of the defendant. 456 U.S. at 167, 102 S.Ct. at 1594.

Here, defendant arguably waived his Fourth Amendment claims by failing to raise them prior to trial. Fed.R.Crim.P. 12(f). His conviction was apparently affirmed on that basis. We would be constrained, therefore, to follow *Frady* and hold that, unless defendant can demonstrate "cause" for his procedural default and can further demonstrate actual prejudice resulting from the admission of illegally seized evidence, his Fourth Amendment claims are not subject to review in this proceeding.

This question becomes academic, however, because defendant has raised the additional claim of ineffective assistance of counsel, an issue clearly cognizable in a § 2255 proceeding. *Strum,* 671 F.2d at 751; *United States v. Frankenberry,* 696 F.2d 239 (3d Cir.1982). The basis of this alternative claim is that defendant's trial counsel did not timely file a clearly viable motion to suppress the shotgun. In order to properly analyze the effectiveness of Foster's trial counsel, therefore, we must, *a priori,* analyze the merits of his Fourth Amendment claims. *See Brown,* 656 F.2d at 363.

B. *Foster's Fourth Amendment Claims*

Defendant contends that the actions of Officer McKenzie constituted at least an investigatory stop and seizure, if not an arrest. Since McKenzie had no legal authority, *i.e.* jurisdiction, to effect such a detention, Foster maintains, any evidence recovered therefrom, namely the shotgun, must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).

The Government counters that there was no "stop," "seizure," or "arrest" of Foster prior to the discovery of the sawed-off shotgun, but merely a "contact" by a police official properly seeking information as to defendant's identity and ability to drive. As such, the Fourth Amendment was not offended.[4]

### 1. Contact, Stop, Seizure and Arrest

A police-citizen encounter triggers Fourth Amendment safeguards only when there is a "seizure" of the person or his effects, whether by an arrest or an investigatory "Terry-stop." Gomez v. Turner, 672 F.2d 134, 139–40 (D.C.Cir.1982); Terry v. Ohio, 392 U.S. 1, 16, 19 n. 16, 88 S.Ct. 1868, 1877, 1879 n. 16, 20 L.Ed.2d 889 (1968); Florida v. Royer, —— U.S. ——, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229, 236 (1983); United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) (brief investigatory stop constitutes Fourth Amendment seizure).[5] The test for determining whether or not a seizure has taken place is an objective, fact-specific one:

> [A] 'seizure' occurs when a police officer, by force or show of authority, restrains the liberty of a citizen. Whether a restraint has occurred is determined, in turn, by reference to the mind of a 'reasonable person.' Combining the two standards, the ultimate issue is not merely whether a reasonable person confronted by an inquisitive police officer would not feel free to walk away, but more precisely whether such conduct constitutes a *show of authority* that would lead a reasonable person to conclude that he is not free to go. (emphasis in original)

Gomez, 672 F.2d at 141. If that seizure is "unreasonable," it violates the citizen's Fourth Amendment rights, and evidence seized as a result of the police misconduct will be suppressed in order to deter future governmental transgressions. See Stone v. Powell, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976); United States v. White, 648 F.2d 29, 32–33 (D.C.Cir.), cert. denied, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981).

A few concrete examples will illustrate the general principles. Briefly detaining a pedestrian in order to request identification or ask a few benign questions, without more, is not a seizure. Gomez, 672 F.2d at 142; Royer, 103 S.Ct. at 1323, 75 L.Ed.2d at 236. Of course, it must be evident to the citizen that he is free to go and that he may decline, without fear of retribution, to answer any questions. Id. On the other hand, ordering the occupants out of a parked car and requesting identification from them, constitutes an investigative seizure which must, at a minimum, meet the requirements of Terry to pass constitutional muster.[6] White, 648 F.2d 29. Finally, the touchstone of a full-blown arrest is the imposition of police custody, such as occurs when a suspect is taken to police headquarters and detained for interrogation. See Dunaway v. New York, 442 U.S.

---

**4.** The Government argues, in the alternative, that, even if the police encounter was illegal, defendant abandoned the shotgun, thereby relinquishing any expectation or privacy he may have had in the weapon. We take this question up at p. 1412, infra.

**5.** The Government does not dispute, nor do we, that the actions of a uniformed Metro Transit Police officer, driving a marked car with flasher operating, and displaying gun and badge, have sufficient trappings of governmental authority to bring the Fourth Amendment into play. See Lucas v. United States, 411 A.2d 360 (D.C. 1980) (special police officers commissioned by the Mayor pursuant to D.C.Code § 4–115 (now § 4–114) are agents of the state for purposes of Fourth Amendment); United States v. Lima, 424 A.2d 113 (D.C.1980) (en banc) (private, unlicensed security guard is not agent of the state); Washington Metropolitan Area Transit Authority Compact ("Compact"), Pub.L. No. 89–774, 80 Stat. 1324 (1966), as amended by Pub.L. No. 94–306, 90 Stat. 672–73 (1976), § 76, set out in D.C.Code § 1–2431 (establishes power to create and maintain Metro Transit Police with all rights and duties of local police force on WMATA's premises).

**6.** Terry requires that, in order to justify a seizure on less than probable cause, there must be a reasonable, articulable suspicion, based on specific, objective facts, that the person seized has committed or is about to commit a crime. 392 U.S. at 21, 88 S.Ct. at 1879; Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Arrests cannot be made but upon probable cause. *Id; Royer,* 103 S.Ct. at 1324, 75 L.Ed.2d at 237.

■ Measuring Foster's encounter with Officer McKenzie against the above-stated guidelines, we have no trouble finding that Foster was seized, at least in the sense of an investigatory stop.[7] Foster and Melby were confronted late at night by McKenzie, a uniformed, armed Transit Police official. He accused Foster of driving without a license and requested Melby's license and the vehicle registration. McKenzie activated the revolving red light on his vehicle and proceeded to conduct radio checks of the documents he obtained. He did not return the documents, nor did he tell Foster and Melby that they were free to leave.

Defendant was aware that McKenzie had radioed for assistance, and, at one point, Foster realized that the officer had drawn his weapon. By all objective standards, Officer McKenzie carried out a traffic stop, and Foster had every reason to believe that he was a prime target of the ensuing investigation. These facts indicate a significant "show of authority" by McKenzie which would cause a reasonable person to believe that he was not free to go.

The Government makes much of the fact that defendant took at least two trips to a steam grate 25 feet from where the cars were stopped. This does not, however, negate the objective indicia of police custody and control set forth above. Moreover, defendant did not attempt to leave the scene, but, rather, returned to the stopped vehicles after each short trip. He was obviously under the impression that his movements were being closely watched.

In sum, we conclude that the actions of Officer McKenzie amounted to, at the very least, an investigative detention which qualified as a Fourth Amendment seizure of Foster's person. We now examine whether that seizure was unreasonable.

### 2. Legality of Officer McKenzie's Conduct

■ Defendant argues that McKenzie had no statutory authority to seize him because, as a Metro police officer, he was acting outside the geographic limits of his jurisdiction. Since the officer's conduct was illegal, defendant maintains, it was unreasonable, and, thus, violated Foster's Fourth Amendment right to be free from such seizures. We accept defendant's contentions.

The parameters of Officer McKenzie's authority to seize individuals suspected of criminal activity are clearly set out in Section 76 of the Compact. Washington Metropolitan Area Transit Authority Compact ("Compact"), Pub.L. No. 89–774, 80 Stat. 1324 (1966), *as amended by* Pub.L. No. 94–306, 90 Stat. 672–73 (1976), § 76, set out in D.C.Code § 1–2431 (establishes power to create and maintain Metro Transit Police with all rights and duties of local police force on WMATA's premises). While on duty in the District of Columbia, he has the same powers, rights and responsibilities as a regular MPD officer. Compact, § 76(b). His jurisdiction, however, is limited to the facilities owned, controlled or operated by WMATA, except in cases of "hot pursuit" from WMATA property. *Id.,* § 76(a). In other words, a Metro Transit Police official cannot patrol the streets of D.C. making traffic stops and/or arrests *unless* the offenses in question originated on or against WMATA facilities. *Compare* D.C.Code § 23–582(a) (authority of special police offi-

---

7. We need not decide whether defendant was, in fact, under arrest prior to the discovery of the shotgun because he concedes that there was probable cause to arrest him for a traffic violation, *viz,* driving without a license. *See* D.C.Code § 40–301(d). Likewise, Officer McKenzie concedes that he did not have statutory authority to arrest defendant because the traffic offense did not take place on or against Metro facilities. *See* Compact, § 76(a). The

real dispute, therefore, centers around whether or not McKenzie "seized" Foster, either by an arrest or a *Terry*-stop, thereby invoking the protection of the Fourth Amendment against unreasonable seizures. Defendant argues that even a *Terry* investigative seizure effected by McKenzie without statutory authority, is unreasonable and, hence, unconstitutional. We discuss this question below.

cer to make warrantless arrest extends only to premises within his jurisdiction except when in fresh pursuit therefrom).

Officer McKenzie was aware of the limits of his authority on the night in question. He quite candidly stated at the April 18 hearing that he did not believe he had authority to stop or arrest Foster and Melby under the facts of this case. (H.Tr. 48–49) [8] They were not operating a motor vehicle on WMATA property, and there was no indication that they were involved in criminal activity on or near any subway stations or bus stops. Thus, McKenzie's subjective conclusion was legally correct; he had no jurisdiction.

▮ As pointed out above, however, McKenzie's initial contact with Foster and Melby escalated into a full-fledged *Terry*-stop when he accused Foster of driving without a permit, and he retained possession of Melby's license and registration pending the arrival of D.C. police officers. This conduct was patently beyond his statutory authority under the circumstances.[9] The question remaining is whether that illegal conduct offends the Constitution. We conclude that it does.

▮ While we share Officer McKenzie's civic concern about reckless, unlicensed drivers, we must also give due regard to the carefully delineated jurisdictional boundaries imposed on local law enforcement personnel by the legislatures. *See District of Columbia v. Perry*, 215 A.2d 845 (D.C.1966) (traffic stop for speeding conducted by Maryland state trooper in the District of Columbia was an illegal arrest since officer had no legal authority to arrest for misdemeanor traffic violations occurring in the District). The concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer. When a law

enforcement official acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause. *See United States v. Di Re*, 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948).

For these reasons, we find that Officer McKenzie's conduct violated defendant's Fourth Amendment rights and, therefore, any evidence tainted as a result of that misconduct could have been suppressed.

### 3. *Abandonment*

The Government contends that, even if Foster was illegally detained and seized by Officer McKenzie, the shotgun was not a fruit of that illegality, but, rather, was discovered because of defendant's voluntary abandonment of the property. In the Government's view, Foster relinquished any expectation of privacy he might have had in the weapon when he walked over to the grassy strip and threw the gun away. Defendant counters that his actions were not voluntary but were, instead, a direct result of the illegal detention.

▮ Warrantless searches and seizures of abandoned property do not violate the Fourth Amendment. *United States v. Burnette*, 698 F.2d 1038, 1047 (9th Cir.1983) (and cases cited therein). A truly voluntary abandonment of contraband can, indeed, remove the taint of an illegal stop or arrest. *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973) (en banc); *United States v. Beck*, 602 F.2d 726, 729 (5th Cir.1979). On the other hand, an abandonment that is the product of police misconduct is not voluntary and cannot, therefore, vitiate the taint of an illegal detention. *Beck*, 602 F.2d at 729–30; *United States v. Morin*, 665 F.2d 765, 770 (5th Cir.1982); *United States v. Gilman*, 684 F.2d 616, 620 (9th Cir.1982).

---

**8.** McKenzie did say that there had been several burglaries of subway farecard machines in recent weeks, and he wanted to ascertain the identities of the occupants of Melby's car to check their names against his list of suspects. This, however, was not offered to justify McKenzie's conduct in stalling for time to await the arrival of MPD units.

**9.** Since operating a motor vehicle without a permit is not a felony, *see* D.C.Code § 40–301(d), McKenzie's actions cannot be justified as a citizen's arrest. *See* D.C.Code § 23–582(b); *District of Columbia v. Perry*, 215 A.2d 845, 847 (D.C.1966).

Whether or not property has been abandoned is a question of intent, to be determined by the objective facts and circumstances surrounding the event.[10]

██ We established above that McKenzie's investigatory detention of Foster and Melby was illegal. If Foster's abandonment of the sawed-off shotgun was a product of that illegal conduct, rather than the result of some other meaningful, intervening event, then the discovery and seizure of the weapon was a fruit of the poisonous tree. *Beck,* 602 F.2d at 730; *Wong Sun,* 371 U.S. at 484–86, 83 S.Ct. at 415–416. On the record before us, we find that defendant's abandonment of the shotgun was a direct result of Officer McKenzie's conduct. Consequently, the seizure of the weapon was tainted with illegality.

This case is factually analogous to *Beck.* There, as here, police officers illegally stopped and detained the occupants of a parked car. The defendants in *Beck* tossed narcotics out of the car onto the street shortly after the police encounter began. That evidence was suppressed because it was found to be the fruit of police misconduct, not voluntarily abandoned property.

In the case at bar, Foster rid himself of the shotgun only after it became apparent that he was not free to leave. The only meaningful intervening event between the initial contact he had with Officer McKenzie, and the disposal of the weapon, was McKenzie's withdrawal of his service revolver. At that point, Foster clearly had reason to believe that he and the car would be searched, and the shotgun discovered.

Under these circumstances, we agree with the Fifth Circuit that, "[t]hese acts of abandonment do not reflect ... mere coincidental decision[s] ... to discard [contraband]; it would be sheer fiction to presume they were caused by anything other than the illegal stop." *Beck,* 602 F.2d at 730.

As a result, like the narcotics in *Beck,* the shotgun was suppressible as a fruit of police misconduct.

### C. Effective Assistance of Counsel

██ It is beyond dispute that an accused has a Sixth Amendment right to counsel, and that right includes the effective assistance of his counsel. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *United States v. Hurt,* 543 F.2d 162 (D.C. Cir.1976). To establish a violation of this constitutional guarantee, the "claimed inadequacy must be a serious incompetency that falls measurably below the performance ordinarily expected of fallible lawyers." *United States v. Wood,* 628 F.2d 554, 559 (D.C.Cir.1980) (en banc) (quoting from *United States v. Decoster (Decoster III),* 624 F.2d 196, 208 (D.C.Cir.) (en banc) (plurality opinion per Leventhal, J.), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979)); *accord, United States v. Green,* 680 F.2d 183, 188 (D.C.Cir.1982). Defendant also bears the burden of showing that counsel's ineffectiveness resulted in prejudice to his case. *Id.; Brown,* 656 F.2d at 363.

██ Defense counsel need not file a motion to suppress in every case where evidence obtained by a search is offered against a defendant. *United States v. Brown,* 663 F.2d 229, 231 (D.C.Cir.1981) (en banc). While a defendant is entitled to the reasonably competent assistance of appointed counsel acting as a diligent, concerned advocate, "counsel must exercise his best professional judgment in deciding whether there are sufficient grounds for filing a motion." *Id.* Moreover, "[i]f counsel makes such a judgment and it falls within the range of competence demanded of attorneys in criminal cases, we may not find

---

**10.** The critical inquiry was well-stated by the Fifth Circuit in *Colbert:*

> [W]hether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no

longer retain a reasonable expectation of privacy with regard to it at the time of the search.

474 F.2d at 176, cited with approval in *United States v. Brown,* 663 F.2d 229, 231–32 (D.C. 1981) (en banc).

**1414**

him ineffective because the perfect vision of hindsight indicates that his judgment may have been mistaken." *Id.*

On the other hand, counsel's unexplained failure to file a facially valid suppression motion, which materially prejudices an accused's defense, is a breach of the duty to act as a reasonably competent attorney, that infects the trial with constitutional infirmity. *Brown,* 656 F.2d at 363.

There is no indication in this record that the failure of defendant's trial counsel to file a motion to suppress was the result of a strategic or tactical decision. Moreover, in light of the arguable merit of defendant's Fourth Amendment claim, the pivotal nature of the allegedly tainted evidence, and the lack of available defenses, we can see little, if any, rationale for counsel's failure.

### IV.  CONCLUSION

In light of the foregoing findings, we conclude that trial counsel's unexplained failure to file a timely motion to suppress, setting forth grounds as stated above, was a breach of the duty to act as a reasonably competent attorney, without the shotgun and other evidence surrounding its discovery and seizure, the Government's case against Foster would have been razor thin, if not nonexistent.  Thus, defendant suffered actual prejudice as a result of his counsel's failure.  We further conclude, therefore, that Foster's Sixth Amendment right to the effective assistance of counsel has been violated and he is entitled to relief under 28 U.S.C. § 2255.

Accordingly, it is, this 7th day of July, 1983

ORDERED that defendant Bobby T. Foster's conviction and sentence in this case be, and the same hereby are, VACATED AND SET ASIDE.