STATE of Maine

v.

Robert E. HARDING.

Supreme Judicial Court of Maine.

Argued June 3, 1985.

Decided April 22, 1986.

Janet T. Mills, Dist. Atty., Mark A. Beede, Asst. Dist. Atty. (orally), Auburn, for plaintiff.

P. Jane Andrews (orally), Lewiston, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and GLASSMAN, JJ.

ROBERTS, Justice.

Robert E. Harding appeals his conviction after a jury trial in the Superior Court, Androscoggin County, of operating a motor vehicle while under the influence of intoxicating liquor, 29 M.R.S.A. § 1312–B (Supp. 1985) and operating after being adjudicated an habitual offender, 29 M.R.S.A. § 2298 (Supp.1985). Harding contends, *inter alia,* that all evidence resulting from his arrest should have been suppressed because the arrest was unlawful. We reject Harding's contention and affirm his conviction.

I.

On November 8, 1983, at approximately 10:00 p.m., Raymond Cloutier was stopped in his car at a railroad crossing in Livermore Falls behind a green van driven by Harding. The van rolled back into Cloutier's car. Cloutier approached the van and asked Harding if the police should be called. Harding apparently responded that he lived at 9 Church Street in Jay and that he would take care of any damage without recourse to the police. Harding did not inform Cloutier of his name or show his motor vehicle operator's license nor did Cloutier request any information. The two men inspected the vehicles and apparently agreed that neither vehicle was damaged. Shortly after Cloutier got back into his car, the van again rolled back and bumped into his car. Both vehicles then left the crossing and Cloutier proceeded to the Livermore Falls police station to report the incident.

At the station Cloutier told Officer Benson of the Livermore Falls police department that he had been involved in an accident and that the other driver lived at 9 Church Street in Jay. He also told Officer Benson that there was little damage to his car but that he thought the other driver might be intoxicated. Benson left for Church Street in his cruiser followed by Cloutier in his own car. En route, Officer Benson radioed Officer Poisson, a Jay police officer, to meet him at Church Street. The Jay address, although physically proximate to the scene of the incident, is in another town and county.

As Officer Benson arrived at 9 Church Street, he saw a van meeting Cloutier's description backing into the driveway. He parked his cruiser in front of the driveway, blocking any escape of the van. Benson approached Harding who had left the driver's seat and entered the back of the van. Benson requested that Harding get out of the van and began asking him questions. Harding did not identify himself and became agitated and angry. After speaking to and observing Harding, Benson concluded that he was intoxicated and arrested him for OUI.

Benson testified that he went to the Church Street address to investigate the report of a hit and run accident and a possible violation of 29 M.R.S.A. § 894 (Class E offense of leaving the scene of an accident without giving name, address and registration number of the vehicle). He further testified that it was not then his intention to make an arrest for OUI.

Harding was indicted for operating under the influence and operating after being adjudicated an habitual offender. Both indictments arose out of the incident and arrest that occurred on November 8, 1983.

Harding's Motion to Suppress Evidence obtained as a result of the stop and arrest on November 8, 1983, was denied. A jury trial resulted in a guilty verdict on each count.

## II.

■ Harding contends that all the evidence resulting from his arrest should have been suppressed because the pursuit and initial stop were unlawful under 30 M.R.S.A. § 2364 (1978).[1] The motion justice determined that Benson's pursuit of Harding was instant pursuit with intent to apprehend as required under § 2364 for misdemeanors and traffic infractions. We disagree. We explained in *State v. Carey*, 412 A.2d 1218, 1220–22 (Me.1980) that the section 2364 distinction between felonies and misdemeanors has its origin in the common law limitation upon the power of a police officer to make a warrantless arrest. Because an officer can arrest without a warrant for the class E violation of section 894 only when the offense is committed in his presence, the officer can be in instant pursuit within the meaning of section 2364 only after such an offense has been committed in his presence. Our determination that Benson did not pursue Harding "instantly," however, does not mean Harding's arrest was rendered unlawful by section 2364.

■ Section 2364 deals with the power of a municipal law enforcement officer to arrest persons outside the limits of the municipality. Nothing contained therein prohibits Benson's trip to Church Street to investigate the possible violation of section 894. Even if we consider Benson's approach to Harding as a "stop," such an investigatory stop was easily justified in

---

1. 30 M.R.S.A. § 2364 (1978) states

Every municipal law enforcement officer in fresh pursuit of a person who travels beyond the limits of the municipality in which the officer is appointed shall have the same power to arrest such person as the officer has within the said municipality. This section shall apply to felonies, misdemeanors and traffic infractions.

With respect to felonies, the term "fresh pursuit" as used in this section shall be as defined in Title 15, section 152; with respect to misdemeanors and traffic infractions, "fresh pursuit" shall mean instant pursuit of a person with intent to apprehend.

these circumstances. *See State v. Cyr*, 501 A.2d 1303 (Me.1985). After Benson approached Harding and observed his condition, Benson had ample probable cause to believe the offense of operating under the influence had occurred in Livermore Falls. We now analyze Benson's authority to arrest for that offense under the interpretation of section 2364 adopted in *Carey*.

■ In *Carey* we applied the "felony" standard of fresh pursuit to an OUI arrest specifically because the Legislature has authorized arrest for OUI without a warrant upon probable cause. The felony standard is merely "pursuit without unreasonable delay" rather than "instant pursuit." Comparing the uncontroverted facts in this case with those in *Carey*, we have no hesitation in saying that *at the moment of arrest* Benson had pursued Harding without unreasonable delay. We see no reason why Benson's authority should not be measured at the moment of arrest and by the nature of the offense upon which arrest was effected regardless of the nature of the offense he set out to investigate. The ruling of the trial court was correct, albeit for the wrong reason.

Other claims of error asserted by Harding are unpreserved, without merit and do not warrant discussion.

The entry is:

Judgment affirmed.

McKUSICK, C.J., and NICHOLS, WATHEN and GLASSMAN, JJ., concurring.

VIOLETTE, Justice, dissenting.

I respectfully dissent. I do not agree that Officer Benson had lawful authority to arrest Harding for operating under the in-

fluence, in the absence of instant pursuit, for a violation of § 894.[1] Furthermore, I disagree that this case is controlled by *State v. Carey*, 412 A.2d 1218, 1220–1222 (Me.1980). For these reasons, the Superior Court should have suppressed the evidence of operating under the influence obtained by Officer Benson in the town of Jay because this conduct was an unlawful arrest and in violation of defendant's rights under the fourth amendment of the United States Constitution.

### I.

I agree with the Court's finding that Officer Benson did not instantly pursue Harding. Yet, the Court finds "no reason why Benson's authority should not be measured at the moment of arrest and by the nature of the offense upon which arrest was effected regardless of the nature of the offense he set out to investigate." (Dec. at 5). I suggest that this reasoning is flawed. When Benson left Livermore Falls, absent instant pursuit, and entered the town of Jay, he was acting without any police authority and acting solely as a private citizen in whatever investigation for a violation of § 894 he had undertaken. In *State v. Carey, supra* we found that the defendant's conduct of operating under the influence of intoxicating liquor and leaving the scene of an accident resulting in personal injury, was conduct amounting to a "felony" for purposes of the fresh pursuit statute. *Id.* The legality of the arrest was determined by whether the Brunswick police officer Labbe, the arresting officer, had probable cause to arrest Carey for those offenses when he undertook pursuit and had pursued him without unreasonable delay. The Court found the officer to be in

---

1. 29 M.R.S.A. § 894 (1978) provides:

    The driver of any vehicle involved in an accident resulting only in damage to a vehicle which is driven or attended by any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible, but shall forthwith return to the scene and in every event shall remain at the scene of the accident until he has given his name, address

    and the registration number of the vehicle he is driving, and exhibited, upon request and if available, his operator's license to the driver or occupant of or person attending any vehicle with which he collided.

    A violation of this section is a Class E crime.

    *Id.*

fresh pursuit, as defined in 15 M.R.S.A. § 152 (Supp.1985). Officer Labbe first observed the defendant at the scene of the accident in Brunswick in an intoxicated condition and showing more than usual interest in the accident. The defendant then left the scene with a companion and started walking across the Androscoggin River bridge towards the town of Topsham. Shortly thereafter, Officer Labbe received a radio communication from another police officer informing him that the defendant's car, found elsewhere, appeared to have been in an accident and was missing the Plymouth Duster emblem found by the arresting officer at the scene of the accident. With this information, Officer Labbe had probable cause to believe that defendant had operated a motor vehicle while under the influence of intoxicating liquor and left the scene of an accident involving personal injury. He forthwith pursued the defendant and arrested him not far from the Topsham end of the bridge.

The facts in *Carey* are clearly distinguishable from the case at bar. In the instant case, all Officer Benson had at best, when he pursued Harding into the town of Jay, was probable cause to believe that the defendant had left the scene of an accident involving property damage. There certainly was no probable cause to believe that he was operating under the influence. In the absence of such probable cause, I maintain his authority as a police officer of Livermore Falls cannot be resurrected, as the Court reasons, when he arrived at Church Street in Jay, and where, for the first time, he obtained probable cause of operating while under the influence. It is my judgment that Harding's conduct cannot be made to fall within the felony section of § 2364 and that Benson's non-instant pursuit constituted a violation of the fresh pursuit statute and was an unlawful and unreasonable seizure under the fourth amendment of the United States Constitution.

II.

*I* now address the question of whether Officer Benson's violation of § 2364 should trigger application of the exclusionary rule requiring the suppression of the evidence resulting from the arrest. Since its inception, the exclusionary rule has been recognized as the primary mechanism available to discourage unlawful police conduct. *Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, (1968). *See Hayes v. Florida*, 470 U.S. ——, ——, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705, 710 (1985); *Welsh v. Wisconsin*, 466 U.S. 740, —— ——, 104 S.Ct. 2091, 2099–2100, 80 L.Ed.2d 732, 745–46 (1984). Courts are split, however, as to whether unauthorized extraterritorial arrests are unlawful and thus unreasonable under the fourth amendment of the United States Constitution.

In *People v. Wolf*, 635 P.2d 213 (Colo. 1981), Denver police officers arrested the defendant for purchasing stolen merchandise. The officers kept the defendant under surveillance and used an informant wired for sound to transact the business with the defendant. The illegal transaction, therefore, was committed in their presence but in Adams County, which was outside the territorial limits of their authority. *Id.* at 214–16. The Court found the officers did not have statutory authority to arrest the defendant because they had neither a warrant, nor were they in fresh pursuit. The fresh pursuit statute required that both the defendant and officers cross territorial boundaries. The officers had already crossed the boundary lines before the unlawful activity took place in their presence. Nevertheless, a majority of the Court found that the police officers had the same authority to arrest as a private citizen under Colorado's citizen arrest statute. This statute provides in pertinent part:

A person who is not a peace officer may arrest another person when *any* crime has been or is being committed by the arrested person in the presence of the person making the arrest.

Section 16–3–201, C.R.S.1973 (1978 Repl. Vol. 8) (emphasis supplied). Thus, the

Court concluded that the arrest was lawful as a citizen's arrest and declined application of the exclusionary rule to the arresting officer's violation of the statute because the police had both probable cause and because the offense was committed in their presence. The Court cautioned, however, that:

> Law enforcement officers should not make excursions into another jurisdiction to ferret out crime without first securing approval of the law enforcement authorities in that jurisdiction, or to make an arrest when they are not in fresh pursuit. In cases where the police act in willful disobedience of the law, the courts have not hesitated to use their supervisory power to exclude evidence....
>
> This Court cannot sanction willful and recurrent violations of the law, and thus, future violations of the statutes governing peace officers' authority to arrest may trigger application of the exclusionary rule and require suppression of evidence obtained in the course of an extraterritorial arrest.

*Wolf* 635 P.2d at 217–18. (citations omitted).

Unlike the Colorado citizen's arrest statute, which allows citizens to arrest for *any* crime perpetrated in a citizen's presence, Maine's corresponding statute has a narrower application. None of the provisions of 17–A M.R.S.A. § 16, warrantless arrests by a private person, would have authorized Benson to arrest Harding as a private citizen for either a violation of 29 M.R.S.A. § 894 or 29 M.R.S.A. § 1312–B (Supp.1985–1986). Benson's arrest of Harding, therefore, cannot be rendered lawful as a citizen's arrest.

In *People v. Hamilton,* 666 P.2d 152 (Colo.1983), the police officers from the Town of Golden executed an arrest warrant upon the defendant inside a bank in Denver, which was outside the territorial limits of their authority. The officers were found not to be in fresh pursuit. *Id.* at 155 n. 3. The Court did not apply the exclusionary rule, finding that violations of "statutory provisions are not *per se* violations of constitutionally protected rights." *Id.* at 156. The Court concluded that even though the arrest was unauthorized, the presence of the warrant "established probable cause for defendant's arrest." *Id.*

The exclusionary rule was applied in the case of *United States v. Foster,* 566 F.Supp. 1403 (D.D.C.1983). In *Foster,* the officer was a member of the Metro Transit Police (M.T.P.).[2] The officer observed the defendant and a companion driving suspiciously and followed them. After a few minutes the defendant, who was driving, stopped the car and switched places with his companion. Thereafter, defendant left the car, walked several feet away and appeared to be retching. The M.T.P. officer radioed for assistance to the Metropolitan Police Department and then asked the defendant for his license and registration. The defendant's companion relinquished both to the officer who began a radio check. The defendant in the meantime took a sawed-off shot gun from his vehicle and again walked several feet away and dropped the gun in the grass. The officer did not know what object the defendant had dropped. The M.T.P. officer did not return the license and registration and at one point, fearing for his safety, drew his gun and kept it in his hand by his side. When the Metropolitan police arrived, the M.T.P. officer walked over to the grassy area and discovered the gun. *Id.* at 1407–08. The Court found that the M.T.P. officer's actions amounted to an investigative detention, qualifying as a seizure under the fourth amendment. *Id.* at 1410. The seizure, however, was found to be unlawful because the M.T.P. officer's jurisdiction was limited to "facilities owned, controlled or operated by W.M.A.T.A., except in cases

---

**2.** The officer ws employed by the Washington Metropolitan Area Transit Authority. (W.M.A. T.A.).

of 'hot pursuit.' " *Id.* at 1411. Further the Court found that the officers' actions could not be justified under the citizen's arrest statute. *Id.* at 1412 n. 9. In applying the exclusionary rule to suppress the evidence obtained after the seizure, the Court held:

> The concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer. When a law enforcement official acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause....
>
> For these reasons, we find that Officer McKenzie's conduct violated the defendant's Fourth Amendment rights and, therefore, any evidence tainted as a result of that misconduct could have been suppressed.

*Id.* at 1412 (citations omitted).

Finally, in *Commonwealth v. Fiume*, 292 Pa.Super. 54, 436 A.2d 1001 (1981), the defendant was subjected to a warrantless arrest for driving under the influence of intoxicating liquor. The accident occurred in Plum Borough but the defendant was taken to a hospital in New Kensington, in another county. The investigating Plum Borough police officer radioed one of his fellow officers who was already at the New Kensington hospital on another matter. This officer asked one of the victims, who was also at the hospital, to identify the person who had been driving the other car. The victim indicated the defendant. The officer attempted unsuccessfully to question the defendant. After smelling alcohol on his breath, however, the officer arrested the defendant. *Id.* 436 A.2d at 1002.

The Court examined the extraterritorial arrest under the fresh pursuit statute. It held that the circumstances of the arrest did not fall within the purposes the legislature envisioned for the statute.

> The provisions were intended to facilitate police pursuit and arrest of persons who violate laws and then attempt to secret the jurisdiction in which they committed the offense. Certainly, the General Assembly proposed to permit police to "pursue" individuals who were also driving while intoxicated over jurisdictional boundaries so that the safety of those people and others might be preserved.
>
> Similarly, the General Assembly sought to permit police the opportunity to obtain evanescent evidence by permitting a continued pursuit. However, the General Assembly did not intend to endorse police investigations involving several members of a police force that did not flow from "continuous pursuit" of offenders.

*Id.* 436 A.2d at 1007. The Court suppressed all the evidence that resulted from the unlawful arrest. *Id.* 436 A.2d at 1008.

### III.

Scrutiny of the legislative history of Maine's fresh pursuit statute (§ 2364) is helpful in determining which line of reasoning to follow. In 1965, legislation was first introduced that was designed to allow local police the power to make fresh pursuit of a misdemeanant. L.D. 871 (102nd Legis. 1965). There was substantial debate in both the Maine House of Representatives and the Senate. Opposition to the bill centered around two issues. First, legislators feared injury to innocent bystanders exposed to high speed automobile chases. Legislators expressed concern for the fact that conduct that started out as a traffic offense would end in unnecessary injury or death of offenders and police officers, as the result of a high speed chase. A second concern was that the police would abuse their power. Legis.Rec. 2175–77; 2225–2229; 2352–55; 2524–2529; 2772–2777; 283–37; 3030–35 (1965). One senator was prompted to say that "this legislation ... is just bringing us one step closer to a police state." Legis.Rec. 2833–34 (1965) (statement of Sen. Collins). The opposition prevailed.

Not until 1971 did another bill on the same subject finally become law.[3] Passage of the bill, however, was still not without heated debate. Again, the opposition centered largely around safety factors and fear of abuse by placing too much discretion in the hands of police officers. Legis. Rec. 1975–79 (1971). Far more telling, however, is the fact that proponents of the bill postured their intent in very limited terms. For example, one senator stated, "I think we ought to pass this bill and give our police officers a little authority." As a matter of clarification that senator said, "fresh pursuit in this sense simply means that a police officer who may be following a drunken driver, and comes to the town line of his own municipality ... would be permitted to cross the town line and make an arrest." (Legis.Rec.1976, 1979 (1971)) (statement of Sen. Tanous). These comments are illustrative of the limited authority this statute was intended to bestow upon municipal police officers. This limiting language demonstrates a clear legislative intent that, absent instant pursuit, Benson had no extraterritorial power to effect the arrest in this case.

To ignore the exclusionary rule as a remedy is tantamount to rendering the statute a legal nullity through nonenforcement, and giving the municipal officers far more discretion than was intended by the legislature. Furthermore, if the exclusionary rule is not applied to violations of the limited powers prescribed by the statute, there is no mechanism to prevent police officers from continually making unlawful arrests in jurisdictions where they have no authority whatsoever. Hence, rather than allowing the police a "little authority," the result of the statute would be to encourage unlawful police conduct. Nonapplication of the exclusionary rule "has the necessary effect of legitimizing the conduct which produced the evidence...." *Terry*, 392 U.S. at 13, 88 S.Ct. at 1875.

**3.** P.L.1971 c. 243; codified 30 M.R.S.A. § 2364. According to one senator this bill had come up "at least a dozen times" but had met with defeat

The basic objective in interpreting § 2364, "is to determine the scope of application the Legislature intended it to have." *State v. Williams*, 433 A.2d 765, 768 (Me. 1981). The provisions of § 2364 "help preserve the political autonomy of municipal subdivisions of government by limiting the extraterritorial authority of municipal police officers to the carefully defined exigencies therein described." *People v. Wolf*, 635 P.2d 213, 218 (Colo.1981) (Quinn, J., dissenting). If the legislature wishes to amend the statute to expand the powers of municipal police officers to arrest misdemeanants extraterritorially, without instant pursuit, that is within the exclusive power of the legislature.

It is clear from the facts presented at the suppression hearing and at trial that Officer Benson's pursuit of Harding was made for the purpose of investigating a misdemeanor pursuant to 29 M.R.S.A. § 894, and as hereinbefore stated, Officer Benson was acting outside the scope of his police authority. The arrest for violation of 29 M.R.S.A. §§ 1312–B (Supp.1985–1986) was, therefore, unlawful. The State in this case should "not be permitted to realize the 'fruits' of its own lawlessness." *Fiume*, 436 A.2d at 1008.

I find the reasoning of the line of cases represented by *Foster*, 566 F.Supp. at 1403 and *Fiume*, 436 A.2d at 1001, a more accurate reflection of the legislative intent expressed in § 2364. I would, therefore, suppress the evidence obtained by Benson in Jay surrounding the unlawful arrest for operating under the influence and remand the case to the Superior Court with instructions to vacate the judgments of conviction for operating while under the influence, 29 M.R.S.A. § 1312–B (Supp.1985–1986) and operating after being adjudicated a habitual offender, 29 M.R.S.A. § 2298 (Supp. 1985–1986).

each time. Legis.Rec.1977 (1971). (Statement of Sen. Conley).