**In re C.A.P., Appellant.**

No. 91–FS–752.

District of Columbia Court of Appeals.

Submitted Oct. 7, 1993.
Decided Nov. 15, 1993.

June M. Perrone was on the brief, for appellant.

John Payton, Corp. Counsel, with whom Charles L. Reischel, Deputy Corp. Counsel, and Mary L. Wilson, Asst. Corp. Counsel, were on the brief, for appellee.

Before STEADMAN and KING, Associate Judges, and NEWMAN, Senior Judge.

KING, Associate Judge:

Appellant seeks reversal of an adjudication of delinquency based on the trial judge's finding, after a bench trial, that he was guilty of unauthorized use of a motor vehicle ("UUV").[1] On appeal, he maintains both that the trial judge erred in denying the motion to suppress[2] and that the conviction is not supported by sufficient evidence. We affirm.

### I.

At the suppression hearing, a patrol officer with the United States Capitol Police testi-fied that on December 5, 1990, at approximately 3:20 p.m., she observed a 1987 Buick Skylark traveling along a section of Washington Avenue, S.W., which is within the jurisdiction of the Capitol Police, attempt to make a left turn onto the blocked-off ramp to I–395 at the beginning of rush hour—a turn that was illegal at that time of day. The officer motioned to the driver to continue forward rather than make the turn. The driver complied and as the Buick passed her cruiser, the officer noticed that the right rear vent window was smashed. She thought it "strange" that the window was not covered since "in December it was kind of cool." Further, the officer testified that in four or five of the six UUV arrests she had made, the stolen vehicle had a broken vent window. Suspecting that the Buick might be stolen, the officer called "communications" to determine whether there had been any reports regarding the vehicle. The officer then began following the Buick, and she activated the cruiser's emergency equipment while both vehicles were inside the Capitol grounds. The Buick proceeded for approximately one and a half blocks before it came to a stop at 3rd and C Streets, S.W., which is outside of the Capitol grounds. The officer received confirmation that the Buick was listed as stolen "[j]ust simultaneously to the same time the [Buick] was pulling to the curve [sic]." The vehicle was occupied by four individuals including appellant, who was sitting in the front passenger seat.

The officer exited her vehicle and approached the Buick on the passenger's side. She observed that a portion of the steering column had been taped over with duct tape. The officer also observed a bent key, one "that did not belong in the ignition," protrud-

---

1. D.C.Code § 22–3815(b) (1989).

2. Appellant sought to suppress "[a]ny and all evidence and information gathered by the stop of the car." We assume that appellant was referring to the officer's observations concerning the condition of the vehicle's steering column and the broken glass inside the car, as well as the photographs of the vehicle that were taken after appellant and the other occupants were arrested. In the trial court, the government did not challenge appellant's claim that the officer's observations and the photographs were susceptible to suppression on Fourth Amendment grounds, nor did the government raise any claim that appellant may have lacked standing to assert any Fourth Amendment violation under the circumstances presented here. Moreover, the government has not challenged appellant's claim, on either of those grounds, in this court. Under the circumstances, we assume, without deciding, that the officer's observations and the photographs were subject to suppression and that appellant had standing to raise a Fourth Amendment challenge to the admissibility of that evidence.

ing half-way out of the ignition. In addition, the officer saw that the rear vent window was completely broken and that there was broken glass on the back seat and rear floorboard. When the officer asked the driver to turn off the ignition, he was unable to do so. When requested, the driver could not produce either a driver's license or vehicle registration. The officer then placed appellant and the other three occupants under arrest.

The trial judge denied appellant's motion to suppress, finding that the officer possessed sufficient information to give rise to reasonable suspicion justifying a traffic stop. Specifically, the trial judge found that: the officer observed the Buick as "[i]t passed by her at a short distance and as it did within the police—the Capitol Police grounds, right at that point she saw a broken rear vent window"; based on the officer's experience with intercepting stolen vehicles, the broken vent window "alerted her suspicions and she got behind the vehicle ... and tried to initiate a stop"; and, "[t]he Capitol Police have authority to complete [the traffic stop] as it was initiated ... inside the Capitol grounds...."

At trial, the officer repeated the testimony she had given at the suppression hearing, and the government introduced photographs of the car taken after the arrest. The Buick's owner, who resided at 107 14th Street, N.E., testified that he last saw the vehicle, which had been parked outside his residence, sometime between 11:00 a.m. and noon on the date appellant was arrested. The trial judge denied appellant's motion for judgment of acquittal and found appellant guilty, concluding that the evidence supported the inference that appellant had knowledge that the vehicle was stolen. This appeal followed.

## II.

In reviewing the trial judge's denial of the motion to suppress, we must first determine whether the officer had reasonable grounds to stop the vehicle. If we conclude that she did, then we must decide whether a Capitol Police officer is authorized to make such a stop outside of that police force's jurisdiction. In reviewing the denial of a motion to suppress, this court gives deference to the trial court's findings of fact, and those findings will not be disturbed if they are supported by the record. *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989) (citations omitted). However, since the ultimate determination of the legality of the stop remains a question of law, we must independently review the trial judge's conclusion that the stop was valid. *Turner v. United States,* 623 A.2d 1170, 1171 (D.C.1993) (citation omitted); *see Brown v. United States,* 546 A.2d 390, 393 (D.C.1988).

In order to initiate an investigative stop an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," justify the stop. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). *See also Brown, supra,* 546 A.2d at 393. The officer testified that she noticed that the right rear vent window was smashed and that she thought it "strange" that the window would not be covered in the December cold. Moreover, the officer also testified that in four or five of the six UUV arrests she had made, the stolen vehicle had a broken vent window. We agree with the trial judge's conclusion that the smashed rear vent window, taken together with the officer's experience with other UUV arrests, was sufficient to support a reasonable suspicion in the officer's mind that the vehicle had been stolen. *Smith v. United States,* 295 A.2d 64, 66 (D.C.1972) (stop was justified where reasonable suspicion existed to believe, based on officer's experience and observations of appellant's highly suspicious conduct, that bag contained proceeds of larceny). Therefore, the officer could properly initiate whatever action was necessary to bring the vehicle to a stop. *See id.* at 67. By the time the Buick stopped, the officer's suspicion had ripened into probable cause since, by that point, she knew from communications that the vehicle had been reported stolen. *Lewis v. United States,* 379 A.2d 1168, 1170 (D.C.1977) (following lawful investigative stop, on-the-scene identification of appellants as robbers provided probable cause for their arrest).

Our conclusion that the officer had a reasonable basis to initiate an investigative stop

does not end our inquiry, however, since we must consider appellant's contention that, even with reasonable suspicion, the stop was illegal because the vehicle was actually stopped outside the Capitol grounds. *See* D.C.Code § 9–115 (1993 Supp.) ("The Capitol Police shall police the United States Capitol Buildings and Grounds ... and shall have the power ... to make arrests within the United States Capitol Buildings and Grounds for any violations of any law ... of the District of Columbia ... or any regulation promulgated pursuant thereto"). We note that the officer initiated the stop when both vehicles were still on the Capitol grounds. Appellant contends, however, that since the vehicles actually came to rest outside the Capitol grounds, the stop was illegal.

■ The trial court found, applying the doctrine of fresh pursuit, that the officer had authority to stop appellant outside the Capitol grounds because the stop was lawfully initiated inside the grounds. We begin our analysis by noting that, when this case arose, the Capitol Police were generally not authorized[3] to make arrests outside the Capitol grounds. Thus, the stop and arrest here, if lawful, can be justified only if permitted by the doctrine of fresh pursuit. There are no common law[4] fresh pursuit cases in this jurisdiction; therefore, we turn to Maryland law, the most authoritative body of law other than our own precedent. *See United States v. Jackson*, 528 A.2d 1211, 1215 (D.C.1987) (District common law consists of common law in force in Maryland in 1801) (citations omitted); *see also Baker v. Gaffney*, 141 F.Supp. 602, 603 (D.D.C.1956) (District derives its common law from Maryland and decisions of Maryland courts on questions of common law are authoritative in the absence of District authority); D.C.Code § 49–301 (1990) (the common law and all British statutes in force in Maryland on February 27, 1801, remain in force unless repealed by or are inconsistent with a subsequent act of Congress).

■ Under the common law doctrine of fresh pursuit, an officer in lawful pursuit could chase an individual, suspected of having committed a felony, into another jurisdiction and effectuate an arrest therein. *Gattus v. State*, 204 Md. 589, 105 A.2d 661, 666 (1954) (citations omitted). In *Gattus*, a search warrant, authorizing the search of an automobile for bookmaking paraphernalia, was executed by police officers following the chase of appellant outside the jurisdiction of the judicial officer who authorized the warrant. *Id.* at 663. Since the search warrant was actually executed (in Baltimore County)

---

3. *But see* D.C.Code § 9–115 (Capitol Police authorized to arrest anywhere in the District for a crime of violence if committed either within the Capitol buildings and grounds or in the officer's presence while in performance of official duties). This provision, enacted on November 5, 1990, and applicable during fiscal year 1991, was in effect at the time of appellant's arrest. For the reason stated *infra, see* note 6, we do not consider whether this provision is applicable in this case.

 In 1992, Congress expanded the arrest power of the Capitol Police by authorizing them:
 to make arrests and otherwise enforce the laws of the United States, including the laws of the District of Columbia—
   (1) within the District of Columbia, with respect to any crime of violence committed within the United States Capitol Grounds;
   (2) within the District of Columbia, with respect to any crime of violence committed in the presence of the member, if the member is in the performance of official duties when the crime is committed;
   (3) within the District of Columbia, to prevent imminent loss of life or injury to person or property, if the officer is in the performance

of official duties when the authority is exercised; and
   (4) within the area described in subsection (b) of this section.
 40 U.S.C.A. § 212a–3(a) (1993 West Supp.). The area described in § 212a–3(a)(4) extends beyond the Capitol grounds and includes the location where the arrest was made in this case. *See* 40 U.S.C. § 212a–3(b).

4. Under the District's Fresh Pursuit statute, "[a]ny member of a duly organized peace unit of any State (or county or municipality thereof) of the United States," who enters the District of Columbia in fresh pursuit, may arrest in the District any individual "who has committed a felony or one who the pursuing officer has reasonable grounds to believe has committed a felony." D.C.Code §§ 23–901, –903 (1989). *See also District of Columbia v. Perry*, 215 A.2d 845, 847 (D.C.1966) (Fresh Pursuit act gives police officer from another state same authority as a District police officer to arrest an individual suspected of committing a felony). The statute does not apply to this case since the pursuit and arrest involved a Capitol Police officer inside the District, rather than a pursuit into the District by an officer from a state.

beyond the issuing judicial officer's jurisdiction (Baltimore City), the court found that the search based on that warrant was unlawful. *Id.* at 664. The search in question, however, could be supportable as one incident to an arrest, if the arrest itself was lawful. *Id.* In making that determination, the court observed that police officers have authority to make arrests outside their jurisdiction under the common law doctrine of fresh pursuit, "whereby an officer may pursue a felon or a suspected felon, with or without a warrant for his arrest, into another jurisdiction and arrest him there." [5] *Id.* at 666 (citing 4 HALE'S PLEAS OF THE CROWN 94; 4 AM.JUR. *Arrest* §§ 17, 51; *McCaslin v. McCord,* 116 Tenn. 690, 94 S.W. 79, 84). *See also People v. Adam,* 74 N.Y.S.2d 57, 60–61 (1947) (observing that legal arrest occurred when Jersey City police pursued defendant through the Holland Tunnel and arrested him in New York City, where he was charged with and convicted of robbery); 5 AM.JUR.2d *Arrest* § 51 (1962) (common law doctrine of fresh pursuit permitted police to arrest, outside their jurisdiction, one suspected of committing a felony).

■ Applying that doctrine to the Capitol Police officer's pursuit of the Buick, we conclude that the officer was authorized to stop the vehicle outside the grounds because she had reason to believe that the Buick had been stolen and the basis for the officer's belief was the observation made by her while both vehicles were inside the grounds. The officer was entitled, therefore, under the common law doctrine of fresh pursuit to complete that stop outside the Capitol grounds.[6]

Appellant, however, relies on *United States v. Foster,* 566 F.Supp. 1403 (D.D.C. 1983), and *Andersen v. United States,* 132 A.2d 155 (D.C.), *aff'd,* 102 U.S.App.D.C. 313, 253 F.2d 335 (1957), *cert. denied,* 357 U.S. 930, 78 S.Ct. 1375, 2 L.Ed.2d 1372 (1958), for the proposition that the officer was without authority to effect a stop of the Buick. In *Foster,* a Washington Metropolitan Transit Authority ("WMATA") officer made a *Terry* stop of a vehicle on a District street based on information gained while both he and the vehicle were outside of WMATA jurisdiction. *Foster, supra,* 566 F.Supp. at 1411–12. A sawed-off shotgun, which Foster had concealed, was recovered near the vehicle. *Id.* at 1408. The court held that the officer exceeded his jurisdiction when he made the stop since he had no police power anywhere other than inside WMATA facilities. *Id.* at 1412. Unlike the instant case, however, all the events in *Foster* occurred outside the officer's jurisdiction and there was, therefore, no issue of fresh pursuit.

Appellant's reliance on *Andersen* is also misplaced. In *Andersen,* the defendant loudly protested a Capitol Police officer's authority to issue a traffic citation to a third person on a street bordering, but just outside, the Capitol grounds. *Andersen, supra,* 132 A.2d at 156. Andersen was convicted of assaulting the officer, an offense committed after he was placed under arrest for disorderly conduct. *Id.* The arrest took place on the same boundary street outside the Capitol grounds. *Id.* In holding that the arrest was lawful, we observed that the Capitol Police are required to police the Capitol grounds, and in order to effectuate that purpose "it was just as necessary to patrol the boundary streets as the areas entirely within the Grounds." *Id.* Since movement of traffic through the grounds was affected by the traffic congestion on the boundary street, the Capitol Police officer had authority to arrest Andersen in that location for conduct that interfered with the exercise of those duties. *Id.* at 157.

5. The *Gattus* court concluded, however, that the fresh pursuit doctrine did not apply in the circumstances presented since the arrestee's conduct was not a felony. *Id.* The court then noted that the fresh pursuit doctrine permits the pursuing officer to effectuate an arrest without a warrant for a misdemeanor committed in his or her presence; however, since no misdemeanor offense was committed in the officers' presence, the arrest was not lawful. *Id.*

6. Since we find that the *Terry* stop was lawful, we need not address the government's contention that the arrest was justified on the grounds either that the charged offense is a crime of violence, *see* D.C.Code § 9–115 (authorizing Capitol Police to arrest anywhere in the District for a crime of violence), or that the arrest was a valid citizen's arrest, *see* D.C.Code §§ 23–582(b) (1989) (authorizing private person to arrest individual whom she has cause to believe is committing a felony in her presence).

Thus, *Andersen* authorizes members of the Capitol Police force to make arrests outside of their jurisdiction if the circumstances leading to the arrest are immediately connected to the exercise of their duties within the boundaries. *Andersen,* therefore, provides no support for appellant's contention that Capitol Police officers are without power to effectuate an arrest off of the grounds—indeed, it stands for the opposite proposition when police out-of-jurisdiction conduct is directly connected with their responsibilities within the jurisdiction.

In sum, we hold that the officer had a sufficient basis for stopping the vehicle and that, under the doctrine of fresh pursuit in the circumstances presented here, she was empowered to effect the stop outside of her jurisdiction. Accordingly, the trial judge did not err in denying the motion to suppress.

### III.

In order to convict a passenger of UUV, the government must show, beyond a reasonable doubt, that the passenger was present in the vehicle with knowledge that the vehicle was being operated without the owner's consent. *In re T.T.B.,* 333 A.2d 671, 673 (D.C.1975). The government established that appellant was riding in a vehicle that was recovered some three to four hours after it had been stolen. Moreover, the officer testified, without contradiction, that the steering column had been broken open and roughly bound with duct tape, a bent ignition key that did not properly fit was protruding half-way out of the ignition, the rear vent window was smashed, and broken glass was visible on the back seat and floorboard. Those observations by the officer were made while she was standing outside of the vehicle on the passenger's side. Based on that testimony, the trial court could readily infer that appellant, who was seated in the front passenger's seat, could see everything the officer could. We are satisfied that this evidence, viewed in the light most favorable to the government, was sufficient to warrant the inference that the vehicle was being operated without the consent of its owner and that appellant would know that to be the case. *In re D.M.L.,* 293 A.2d 277, 278 (D.C.1972) (evi-

dence that ignition system had been tampered with and was clearly visible to passenger in rear seat of automobile was sufficient to sustain delinquency adjudication). Accordingly, we conclude that the evidence was sufficient to support an adjudication of the offense of unauthorized use of a motor vehicle.

*Affirmed.*