Calvin D. MOORE, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1537.

District of Columbia Court of Appeals.

Argued April 20, 2000.
Decided Aug. 10, 2000.

Sydney J. Hoffman, for appellant.

Luis Andrew Lopez, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown, and Tracey S. Lankler, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, REID, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

After a jury trial Calvin D. Moore was found guilty of receiving stolen property,[1] one count of unauthorized use of a motor vehicle,[2] and one count of possession with intent to distribute a controlled substance (crack cocaine).[3] Moore argues on appeal that 1) the government submitted insufficient evidence to support his convictions for unauthorized use of a motor vehicle, receiving stolen property, and possession of crack cocaine, and 2) the trial court abused its discretion by limiting the scope of Moore's examination of a witness. We affirm.

## I. FACTUAL BACKGROUND

Ms. Carol Byrne, a New York resident, testified that on August 22, 1997, she had driven to the District of Columbia to assist her daughter move into her college living quarters. Ms. Byrne unloaded her daughter's belongings from her 1990 Toyota Camry, and then parked her car on Macomb Street, N.W. Ms. Byrne locked the car and took her keys with her. When Ms. Byrne returned to retrieve her car between 2:00 p.m. and 3:00 p.m. on that same day, her car was missing. She immediately reported the car stolen to the police. At trial, Ms. Byrne testified that she did not know Moore and did not give him or anyone else permission to use her car.

On October 17, 1997, Officer Robert Bryant of the Metropolitan Police Department was sitting in his marked squad car at a stop light in Georgetown when Moore approached his car and initiated a conversation with him. Moore was familiar with Officer Bryant because he frequented the Georgetown area and Moore had held conversations with him in the past. Moore informed Officer Bryant that the rumors floating around the area that he was selling drugs were false, and that a man named "Tex," who was responsible for starting the rumors, was actually the person selling drugs. Moore also told Officer Bryant that he had procured a new job and that he had been given a cellular phone and a company car. Officer Bryant also testified that Moore informed him not to be alarmed if he (Moore) was seen driving a Toyota with New York plates because the car was not stolen.

Officer Bryant became suspicious of Moore's volunteered denials of driving a stolen car and began to inquire for more information from Moore about the car. Officer Bryant asked Moore for the license plate number of the car, and Moore offered some numbers and letters, but could not conclusively state the correct order of the numbers and letters. Officer Bryant asked Moore where the car was parked, and he responded that the car was on 31st Street, N.W. Officer Bryant told Moore that he would go to the car and check it out, and their conversation ended. Officer

---

1. D.C.Code § 22–3832(a), (c)(1) (1996 Repl.).

2. D.C.Code § 22–3815.

3. D.C.Code § 33–541(a)(1) (1998 Repl.).

Bryant found the car parked on 31st Street, N.W., checked the license plate against a "hot sheet," and discovered that the car had been reported stolen. Officer Bryant called for assistance, and Officer Mark Dimiduk responded to stake out the car. After a few minutes, Moore approached the car and got in. A few minutes later, Moore "zipped off" in the car at a "pretty fast pace." Officer Dimiduk was in an unmarked car and plain clothes, so he called for assistance, and other marked units responded to the call and stopped Moore a few blocks away.

Moore was taken from the car and arrested. Officer Bryant then began a search of the car. Officer Bryant located some medical papers with appellant's name on them and a small film canister behind an upright armrest in the middle of the back seat. Officer Bryant opened the film canister and found ten small ziplock bags, each containing a rocklike substance, later confirmed to be crack cocaine. Officer Bryant then discovered that a crime scene search officer, Officer Israel Ruiz, was en route to the scene, and thereafter stopped searching the car. Officer Ruiz arrived at the scene to search the vehicle further and found five more ziplock bags containing a rocklike substance under the right rear floor mat. Officer Ruiz conducted field tests on the drugs found in the armrest and under the floor mat, dusted the car for fingerprints, and took photographs of the car, Moore's personal medical papers, and the drugs.

Detective Charles Culver, an expert on drug evidence procedures and drug distribution, packaging, sales and use, testified at the trial that the packaging and amount of drugs found in the car were consistent with distribution rather than personal use.

Moore also testified. He stated that on October 16, 1997, he was living at a halfway house because of a previous conviction for possession of cocaine. At 7:25 p.m. on that date, Moore checked out of the half-way house, not to go to work, but to go to D.C. General Hospital in Southeast, Washington, to pick up some prescriptions. Once outside of the halfway house, he ran into Ms. Brenda Brooks, the girlfriend of another resident in the halfway house. He testified that he had known Ms. Brooks for one month and that she agreed to let him use her car. After dropping off Ms. Brooks on 16th Street in Northeast Washington, Moore proceeded to D.C. General Hospital. Moore then left the hospital in Southeast Washington and drove to get something to eat at Subway sandwich shop in Georgetown. After arriving in Georgetown, Moore saw Officer Bryant and decided to initiate a conversation to "clear his good name" of the accusations that he was dealing drugs. Moore testified that he did not tell Officer Bryant that he was driving a company car and further stated that he only mentioned that the car he was driving was not stolen because he heard a lookout for a stolen Toyota Camry on the police radio.

Moore testified that he had only been driving the car for about five hours and that he had not been in the car previous to that night. He also stated that the only papers he had in the car were sitting on the front passenger seat along with a hat and his cellular phone. Moore testified that he did not know the car was stolen and denied any knowledge of the drugs found in the car. He also stated that he never heard from Ms. Brooks again after October 16, 1997.[4]

## II. SUFFICIENCY OF THE EVIDENCE

After reviewing the record, we agree with the government that there was sufficient evidence to support Moore's convictions for unauthorized use of a motor vehicle, receiving stolen property, and possession with the intent to distribute crack cocaine. In reviewing sufficiency claims, we view the evidence and draw all infer-

4. Ms. Brooks did not testify at the trial.

ences in the light most favorable to the government. *See Speight v. United States*, 671 A.2d 442, 454 (D.C.1996). This court defers "to the fact finder's right to weigh the evidence, determine the credibility of witnesses, and draw inferences from the evidence presented[.]" *Patton v. United States*, 633 A.2d 800, 820 (D.C.1993) (citations omitted). We do not distinguish between direct and circumstantial evidence when reviewing a sufficiency claim. *See Chambers v. United States*, 564 A.2d 26, 30–31 (D.C.1989). In fact, evidence is legally insufficient to support a conviction "only where there is no evidence upon which a reasonable mind could infer guilt." *Patterson v. United States*, 479 A.2d 335, 338 (D.C.1984) (citation omitted).

## A. Unauthorized Use of a Motor Vehicle and Receiving Stolen Property

■ On appeal, Moore asserts that the government presented insufficient evidence to support his convictions by the jury for unauthorized use of a motor vehicle and receiving stolen property. Moore argues that there was insufficient evidence of the knowledge element of these crimes, specifically that there was not sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Moore in fact knew the vehicle in question was stolen. With respect to his conviction for unauthorized use of a motor vehicle, the government had to prove beyond a reasonable doubt that (1) appellant took a motor vehicle, or used, operated, or removed a motor vehicle from any place; (2) appellant operated it, drove it, or caused it to be operated or driven for his own profit, use or purpose; (3) appellant did so without the consent of the owner; and (4) at the time appellant took, used, operated or removed the vehicle he knew that he did so without the consent of the owner. *See Grant v. United States*, 402 A.2d 405, 409 n. 9 (D.C.1979); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.48 (4th ed.1993). In order to convict Moore of receiving stolen property, the government had to prove that (1) the prop-

erty in question was stolen by someone; (2) appellant received, possessed or obtained control of the property in question; (3) at the time appellant received, possessed or obtained control over the property, he knew or had reason to believe that the property was stolen; (4) at the time appellant so acted, he had the intent to deprive another of the right to the property or to a benefit of the property; (5) at the time appellant acted, he intended to disobey the law or acted in conscious disregard of the law; and (6) the property had a value of $250 or more. *See Blackledge v. United States*, 447 A.2d 46, 48–49 (D.C. 1982); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.44 (4th ed.1993).

■ The owner of the car, Ms. Byrne, testified that after she parked her car on Macomb St., N.W., she retained the key to her car, and the key was not left in the car before it was stolen. Officer Dimiduk testified that the Toyota key used by Moore to start the car was bent and required extra force to fit in the ignition. Finally, Ms. Byrne testified that the key Moore used to start her car was not the key to her car. From this evidence, one could reasonably conclude that Ms. Byrne did not give anyone the key to her car or permission to use it. Additionally, because there was testimony that the key used to start the car was bent and required force to fit into the ignition, one could reasonably infer that Moore had knowledge that the vehicle was being operated without the owner's consent, thereby supporting his conviction for unauthorized use of a motor vehicle. *See In re C.A.P.*, 633 A.2d 787, 792 (D.C.1993).

■ There are several pieces of evidence supporting Moore's conviction for receiving stolen property. As aforementioned, the fact that the key he used to operate the car was bent and did not easily fit in the ignition permits the fact finder to infer Moore's knowledge that the car in his possession was stolen. In addition, the

testimony that Moore sped off at a high speed when he returned to the car after Officer Bryant informed Moore that he was going to check out the car, allows for the inference that Moore knew the car was stolen and that he wished to escape before Officer Bryant could investigate the car. *See United States v. Irving,* 141 U.S.App. D.C. 216, 222, 437 F.2d 649, 655 (1970) (commenting that the jury could infer from appellant's desperate flight a consciousness of guilt). Moreover, Moore's volunteered statement to Officer Bryant that the Toyota he was driving was a company car and was not stolen is also significant evidence of his consciousness of guilt. *See id.; see also United States v. Covington,* 459 A.2d 1067, 1071–72 (D.C.1983).

In *Covington,* this court articulated that "evidence of [an] appell[ant]'s consciousness of guilt is highly significant. It constitutes strongly corroborative circumstantial evidence from which the jury reasonably could infer appell[ant]'s ... purpose to commit a crime." 459 A.2d at 1071–72. The evidence in the record reflects that Moore flagged down Officer Bryant, without being stopped by Officer Bryant. Moore then, without being questioned, offered that there was no reason for Officer Bryant to believe that he was driving a stolen car, obviously, but not cleverly, in an attempt to dissuade the officer from possibly investigating the car he was driving. Given Moore's suspicious denial that he was not driving a stolen car, the jury could very well infer that Moore knew he was driving a stolen car and that his intent in approaching Officer Bryant was to discourage any police investigation of his crime. *See id.*

Furthermore, Moore's testimony could have been viewed as incredible by the jury because it did not support his proffered defense that he borrowed the car from Ms. Brooks. "This court has previously held that a jury may infer the requisite state of mind for the offense of receiving stolen property where evidence reveals defendant's unexplained (or unsatisfactorily explained) possession of recently stolen property." *Blackledge,* 447 A.2d at 50; *See also Charles v. United States,* 371 A.2d 404, 406 (D.C.1977) ("possession of the fruits of a crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only prima facie evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence") (internal quotation marks omitted) (citations omitted). Indeed, Moore was unable to adequately explain the simple arrangements made between himself and Ms. Brooks on the day he allegedly borrowed her car. Moore testified that he and Ms. Brooks left the halfway house in Northeast Washington, that they drove to 16th Street, N.E., where he dropped off Ms. Brooks, that he continued to D.C. General Hospital in Southeast Washington to fill a prescription, and that he then proceeded to Georgetown to get food to eat at a Subway sandwich shop.[5] However, when the government asked Moore when had he arranged to pick up Ms. Brooks and return the car to her, he could only answer that he had not set a time to pick her up, and that she would wait on a street corner for an indeterminate period of time until he returned.[6] Moore's initial refusal and

---

5. Moore's testimony that he drove from D.C. General Hospital in Southeast Washington to a Subway sandwich shop in Georgetown because other eating establishments in Southeast Washington, or near the halfway house in Northeast Washington were closed at that late hour of the day, is also questionable.

6. The exchange between the prosecutor and Moore was as follows:

Q: What time did she tell you to meet her back there?
A: After I finished doing what I had to do.
Q: And what time was that?
A: I never made it back. I was locked up. So how can I meet her back to pick her up?
Q: She was just going to stand on the street until you came back there?
A: I was locked up, miss. So how she going—how I'm going to pick her up?

ultimate inability to answer this simple question posed by the government could suggest not only his evasiveness when presented with a question about the person who loaned him the car, but also the untruthfulness of his defense that he borrowed the car. Thus, Moore's inability to satisfactorily explain his sole possession of Ms. Byrne's Toyota, stolen only two months prior to his arrest in this case, is "sufficient proof to permit the jury to infer [his] guilty knowledge...." *Blackledge,* 447 A.2d at 50; *see also United States v. Johnson,* 140 U.S.App.D.C. 54, 60 n. 40, 433 F.2d 1160, 1166 n. 40 (1970) (affirming conviction for grand larceny where appellant was in possession of property stolen approximately nine months prior to his arrest).

Moore's testimony essentially concedes that he had not made any arrangements to pick up the alleged owner of the car, Ms. Brooks, that he never saw her again after October 16, 1997, and that she never called him to inquire the whereabouts of her car. The jury apparently chose not to accept Moore's weak explanation for his possession of the car and "reasonably inferred the requisite intent for both crimes from his possession of the stolen property and other circumstances." *Blackledge,* 447 A.2d at 50. Therefore, the jury could properly infer from the evidence in the record that Moore knew he was operating the car without the owner's consent and that Moore knew that the car he was operating was stolen.

## B. Constructive Possession

Moore also argues that there was insufficient evidence to support his conviction for possession with the intent to distribute crack cocaine because the government failed to prove that he constructively possessed the drugs found under the armrest and under the floor mat in the back seat of the car.[7]

■ To convict Moore of possession with the intent to distribute the crack cocaine, the government had to prove constructive possession because the drugs were not found on his person. In order to prove constructive possession, it is necessary to demonstrate that Moore "(1) knew of the location of the [crack cocaine]; (2) had the ability to exercise dominion and control over it; and (3) intended to exercise dominion and control over it." *McDaniels v. United States,* 718 A.2d 530, 531 (D.C.1998) (internal quotation marks omitted) (citations omitted).

■ The evidence in the record reveals that Moore had sole physical possession and control of the car in which the drugs were found.[8] *Compare In re T.M.,*

Q: But you were supposed to meet her back at 16th Street, Northeast?
A: 16th Street, Northeast.
Q: At what time, sir?
A: After I finished.
Q: What was Ms. Brooks suppose to do the entire time while you were at D.C. General Hospital before you returned? Was she supposed to stand there on the street?
A: She wasn't there. She wasn't on 16th Street.
Q: Where was she?
A: I got something to eat. She dropped herself off at 16th Street.
Q: And what time were you supposed to meet her back at 16th Street?
A: After I finished doing what I—after I finished—after I finished leaving from Georgetown, I was supposed to meet her back there at the corner where she dropped herself off.

Q: And you all did not agree upon any time?
A: No.
Q: So she was just going to stand on the street until you got back there. It could have been at noon the next day, is that correct?
A: Might have been.
Q: She was just going to stay there all night?
A: Might have been.

7. Moore does not contest that the quantity and packaging of the drugs recovered from the car were consistent with an intent to distribute.

8. At a minimum Moore's testimony concedes that he was in control of the car for several hours prior to his arrest. However, because we have already concluded that there was

577 A.2d 1149, 1152 (D.C.1990) (where the court overturned a conviction based on constructive possession because the appellants "were two of six persons roughly equidistant from the contraband when the police burst into the apartment"). In addition, Officer Bryant testified that Moore's personal medical papers were found in the same hiding space, directly on top of the film canister that contained the ten ziplock bags of crack cocaine.[9] Moreover, Moore's failed attempt to persuade Officer Bryant that he did not sell drugs exhibited his consciousness of guilt and allows for the reasonable inference of Moore's "purpose to commit a crime." *Covington*, 459 A.2d at 1071–72. Moore's unusual statement to Officer Bryant permits a reasonable inference by the jury that, in fact, Moore did sell drugs, and that he harbored the requisite intent to exercise exclusive dominion and control over the drugs found in the car he operated. *See id.*

Moore's exclusive control of the car, the recovery of his personal medical records in the same hiding space as the drugs, and his volunteered denial of any involvement with the sale of drugs constitutes evidence sufficient to support his conviction for possession with the intent to distribute crack cocaine, based on the theory of constructive possession. Therefore, drawing all inferences in the light most favorable to the government, we cannot conclude, looking at the totality of the evidence presented in this case, that there was no evidence upon which a reasonable mind could infer

Moore's guilt for each of his convictions beyond a reasonable doubt. *See Patterson*, 479 A.2d at 338.

## III. LIMITING THE SCOPE OF MOORE'S EXAMINATION OF OFFICER DIMIDUK

Moore also argues on appeal that the trial judge violated his Sixth Amendment rights by improperly curtailing his direct examination of Officer Dimiduk, and limiting his cross-examination of Officer Dimiduk after the trial court reopened cross-examination of the witness.

 The trial court is "entrusted with a large measure of discretion to control the introduction of evidence[.]" *Baker v. United States*, 131 U.S.App.D.C. 7, 36, 401 F.2d 958, 987 (1968). Although "the opportunity to cross-examine a witness is a fundamental right, which is guaranteed in a criminal trial through the [C]onfrontation [C]lause of the Sixth Amendment[ ]", *Singletary v. United States*, 383 A.2d 1064, 1073 (D.C.1978) (citations omitted), "the extent and scope of cross-examination of a witness ... is committed to the sound discretion of the trial court." *Morris v. United States*, 389 A.2d 1346, 1352 (D.C. 1978). "[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination in whatever way, and to whatever extent, the defendant might wish." *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (internal quotation

---

sufficient evidence for the jury to conclude that Moore had knowledge that he was driving a stolen car, the jury, disbelieving that he borrowed the car from Ms. Brooks, could infer that he was in possession of the car for longer than he admits. In fact, although Moore was not charged with stealing Ms. Byrne's car, from his possession of the recently stolen property, the jury could reasonably infer that Moore was the thief and had been in exclusive control of the car since its theft. *See* Criminal Jury Instructions for the District of Columbia, No. 3.06 (4th ed.1993). Thus, the fact that Moore was not the owner of the car and that the drugs were not in plain view is not determinative of Moore's knowledge,

ability, and intent to control the drugs found in the car he exclusively controlled.

9. Moore argues that there is some doubt as to why his medical records that were allegedly removed from the compartment with the drugs were not recorded on the PD–163, the main police report that is used to detail all events incident to an arrest. However, even if the papers were not listed on the PD–163, Officers Dimiduk and Ruiz testified that Moore's personal medical papers were removed from that area, and the jury was entitled to believe or disbelieve their statements. *See Patton*, 633 A.2d at 820.

marks omitted) (citation omitted) (emphasis in original). Furthermore, "once a party has had an opportunity substantially to exercise the right of cross-examination, the extent of further interrogation is within the sound discretion of the trial court and reversal by an appeals court is warranted only where an abuse of discretion leads to prejudice." *Singletary*, 383 A.2d at 1073 (citations omitted).

■ The record reflects that Officer Dimiduk was originally called as a witness during the government's case in chief. He testified on direct examination that he was responsible for filling out the PD–163 on the night of Moore's arrest, and that he had included all crucial information in the report. He also testified that he observed Officer Bryant remove some papers from behind the armrest in the rear of the car, along with the film canister containing crack cocaine. After the government's direct examination of Officer Dimiduk, Moore fully exercised his right to cross-examine Officer Dimiduk. During Moore's cross-examination of Officer Dimiduk, however, he chose not to question the officer with respect to why the personal medical papers linking him to the crack cocaine were not recorded on the PD–163. Instead, once the government rested its case, Moore called Officer Dimiduk as his first witness and attempted to ask him why the PD–163 did not reflect that Moore's personal papers were found in the hiding place with the crack cocaine. Because the trial court disallowed Moore's questioning with respect to the PD–163 on direct examination in the defense's case in chief, Moore attempted but was prohibited from questioning the officer about the absence of the personal medical papers from the PD–163 again when the trial court reopened cross-examination of Officer Dimiduk for another limited purpose.

In this case, there is no question that Moore had a copy of the PD–163 in his possession and could have elicited this very information during his cross-examination of Officer Dimiduk. Moore either made a tactical decision not to pursue this line of questioning, or mistakenly forgot to question the officer before he was excused as a witness. In any event, after a thorough and exhaustive examination of the officer, Moore offered no explanation as to why he could not confront Officer Dimiduk with the omission of the personal medical papers from the PD–163 on cross-examination. Thus, having had the opportunity to cross-examine Officer Dimiduk on this issue, it was within the trial court's discretion to disallow Moore any further examination of this witness. *See Green v. United States*, 718 A.2d 1042, 1061 (D.C.1998); *United States v. Gaviria*, 325 U.S.App. D.C. 322, 348, 116 F.3d 1498, 1524 (1997). Finally, the trial court reopened Moore's cross-examination of Officer Dimiduk for the specific purpose of inquiring about his grand jury testimony which was not provided to Moore until after the government's direct examination of the officer. The trial court reopened cross-examination of the officer upon Moore's request for this limited purpose only, and again it was within the trial court's discretion at this time to afford Moore a second chance to inquire about the omission of the papers from the PD–163. *See Green*, 718 A.2d at 1061.

Moore had the opportunity and did effectively cross-examine Officer Dimiduk in this case. Moore was able to present to the jury during cross-examination and during his closing statement the inconsistencies between Officer Dimiduk's trial testimony and his grand jury testimony, as well as the inconsistencies between Officer Dimiduk's testimony and the trial testimony of Officers Bryant and Ruiz. In addition, we cannot discern any prejudice to Moore because he was not precluded from arguing in his closing statement to the jury that his personal medical papers allegedly found with the crack cocaine were never recorded on the PD–163. Moreover, the record does not reveal that the trial court's ruling kept the jury from relevant and important facts. *See Lawrence v.*

*United States,* 482 A.2d 374, 376 (D.C. 1984). Moore proffers no reason why he could not have questioned the officer about the PD–163 on cross-examination. Therefore, in this case, Moore's contention that the trial court abused its discretion by not permitting him to further question Officer Dimiduk must fail.

Accordingly, the judgment of the Superior Court is hereby

*Affirmed.*