905 A.2d 201 (2006)
In re R.K.S., Appellant.
No. 04-FS-1231.
District of Columbia Court of Appeals.
Argued May 17, 2006.
Decided August 3, 2006.
*203 R. Michael LaBelle, Washington, DC, appointed by the court, for appellant.
Janice Y. Sheppard, Assistant Attorney General, District of Columbia, with whom Robert J. Spagnoletti, Attorney General, Edward Schwab, Deputy Attorney General, and Rosalyn Calbert Groce, Chief, Juvenile and Criminal Section, were on the brief, for appellee.
Before REID and FISHER, Associate Judges and SCHWELB, Senior Judge.[*]
REID, Associate Judge:
This is one of two related cases which we decide today. The other case is In re T.H., 905 A.2d 195 (D.C.2006). Appellants in both cases are brothers and juveniles who were adjudicated on charges of unauthorized use of a vehicle ("UUV") and receiving stolen property ("RSP"). We reverse R.K.S.' convictions on the ground that he was denied his constitutional due process right, as well as his statutory right and his entitlement under the Superior Court's Family Division  Juvenile Branch rules, to the effective assistance of counsel. However, we remand R.K.S.' case to the trial court for a new trial on the UUV and the RSP charges.[1]

FACTUAL SUMMARY
On July 15, 2004, the Office of the Attorney General, District of Columbia, filed a petition in the Family Division  Juvenile Branch of the Superior Court of the District of Columbia  alleging that R.K.S., then fourteen years of age, "on or about July 14, 2004, within the District of Columbia, took, used, operated, or removed, a motor vehicle, and did operate or drive that motor vehicle for his own profit, use or purpose, without the consent of Heidi *204 Fick, the owner of that motor vehicle, in violation of D.C.Code, 2001 Ed. § 22-3215." A second charge alleged that "on or about July 14, 2004, . . . [R.K.S.] received, possessed, and obtained control of property of value of $250.00 or more, consisting of an automobile which belonged to Heidi Fick, and which had been stolen with the intent to deprive Heidi Fick or another of the right to the property or the benefit of the property, in violation of D.C.Code. . . § 22-3232(a) and (c)(1)." The same charges were filed against T.H., R.K.S.' then seventeen-year-old brother.
At trial, beginning on August 19, 2004, the government presented testimony by four witnesses: the owner of the automobile involved in the charges against T.H. and R.K.S., a Maryland State trooper, and two detectives from the Charles County, Maryland Sheriff's office. Ms. Fick, a resident of La Plata, Maryland and the owner of a beige 1997 Toyota Camry, left work on the morning of July 14, 2004, and returned to her home around 11:30 a.m. to pick up her infant son. She dismissed the babysitter, placed her car key on the kitchen counter and proceeded upstairs. When she returned to the kitchen area, her car key was not there and the car was not in the parking lot. Thinking that her husband might have "taken the car for some reason," she called him. He instructed her to call the police. As a result of a call from a Maryland State trooper later in the day, Ms. Fick went to Forestville, Maryland where she identified her car. Her key was in the ignition, but she had given no one, including T.H. and R.K.S., permission to take or use her Camry.
David Darnell Thomas, a Maryland State trooper, received information on July 14, 2004, that he should be "on the lookout for [a] Toyota Camry, gray in color  grayish-green." When he saw the vehicle, Trooper Thomas activated his emergency lights and the vehicle moved to the side of the road and stopped. His superiors advised him to wait for backup before exiting his police car. Before backup arrived, the Camry took off, and Trooper Thomas pursued it along Route 5. He observed two rear seat passengers "looking back at [him]" repeatedly during the "15 to 17 mile[]" chase. Trooper Thomas followed the Camry into the Southeast quadrant of the District of Columbia. When the vehicle hit a curb and crashed into the sidewalk, it came to a halt. Four persons exited and ran in different directions. Trooper Thomas pursued and apprehended one of the rear passengers whom he identified in court as R.K.S. Another law enforcement officer caught T.H. as he ran from the scene of the crash. Trooper Thomas identified T.H. when he was returned to the scene of the crash in a patrol car. He also made an in-court identification of T.H. as one of the other passengers in the Camry. Trooper Thomas was "one hundred percent sure" of his identification of R.K.S. and T.H. He identified the vehicle which he stopped by the VIN number and the license plate, both of which matched the Camry taken from the parking area outside of Ms. Fick's residence. In cross-examining Trooper Thomas, counsel for T.H. sought to show that T.H. had not been driving the Camry. Counsel for R.K.S. did not cross-examine Trooper Thomas.
Upon learning that "[t]wo persons were apprehended in a stolen vehicle . . . believe[d] [to be] related to [a] burglary and homicide [in Maryland]," Timothy Miner, a detective in the Charles County Sheriff's office, traveled to the District of Columbia to interview R.K.S. at the Metropolitan Police Department's ("MPD") Seventh *205 District station.[2] He was asked to assist Detective John Richard Elliott, who was also employed by the Charles County Sheriff's office. Detective Miner went into the room where R.K.S. was seated; one of R.K.S.' hands "was handcuffed to the wall." Detective Miner read R.K.S. his rights "from a card [he] [kept] in his wallet." He then took a statement from R.K.S. over a two-hour period, which was read at trial and introduced into evidence.[3] The statement implicated R.K.S. in the taking of the Camry and the chase into the District.
According to R.K.S.' statement, earlier on the morning that the Camry was taken, R.K.S., who resided in the District, and his brother, T.H., also a District resident, were picked up in the District by M. and a friend of M., in a blue Nissan van which belonged to M.'s sister. R.K.S. and T.H. "had called [M. and his friend]." R.K.S. expressed reluctance to go with the other boys to Charles County, but M. told him, "shut up, stop acting like a little b* * *h before I slap you." They drove to Charles County and met M.'s friend who was in a white van, with no windows. R.K.S. had been instructed to sit in the car and watch out for M.[4] M. told R.K.S., "I'm going to get my bike." When a truck arrived, the van drove off. The blue van proceeded down the street, and eventually crashed. M. said he was going to get a bike, but "[h]e came down the path with the Camry. He said get in. The car isn't stolen. The keys are in the car." M. drove away and was "going over the speed limit" when they saw a police car. R.K.S. told M. to pull over, and eventually he did, but "he pulled back out." R.K.S. maintained that he did not steal anything, that he faked being a lookout "so he wouldn't have to fight [M.]." R.K.S. said that it was his first trip to Charles County.[5]
Prior to cross-examining Detective Miner, counsel for T.H. "request[ed] Jencks [material] [Jencks Act, 18 U.S.C. § 3500] with respect to this officer." The Assistant Attorney General ("AAG") stated that he had received no other material from Detective Miner, and that he did not take any notes when he spoke with Detective Miner prior to trial. When counsel for T.H. asked several questions designed to determine the existence of Jencks material, the trial judge expressed doubt as to whether the Charles County officers were subject to the Jencks Act. Counsel for T.H. also explored the nature of the interactions between the District's MPD and the Charles County Sheriff's office, and whether notes were taken. Detective Miner indicated that he had placed information he obtained from the District's police officers, as well as personal notes he had made, in a notebook which he had not turned over to the District. When asked whether Detective Miner knew that R.K.S. was fourteen-years-old when he interviewed *206 him, Detective Miner replied, "Yes." He did not give R.K.S. a card to sign showing that he understood his rights and wanted to waive them. No District officer was in the room when R.K.S. was interviewed, and the interview was not recorded.
Counsel for R.K.S. did not immediately cross-examine Detective Miner, that is, on August 19, 2004, since she took the position that she was not participating in the proceeding. She cross-examined the detective on August 23, 2004, however, when he returned for that purpose, after the trial court admonished her for not providing representation for R.K.S. During the cross-examination by R.K.S.' counsel, Detective Miner traced his movements and actions from the time he was asked to assist Detective Elliott in the District to the conclusion of the statement made by R.K.S. He spoke with R.K.S.' mother by telephone after the interview. R.K.S. cried at times during the interview but did not appear to be frightened. Detective Miner informed R.K.S. that the Camry had been stolen, and that there had been a motor vehicular death, but on redirect examination, Detective Miner agreed that R.K.S. said "someone stole the car." Counsel for R.K.S. also confirmed that R.K.S. was given no water, or anything to drink while he was being interviewed. Detective Miner and Detective Elliott conferred in the hall during their respective interviews with R.K.S. and T.H. to "shar[e] information." Detective Miner acknowledged that R.K.S. informed him that an older person in the stolen Camry had told him "to stop acting like a b* * *h" when he said he wanted to go home; and that if that person got caught he was "going to f* *k [R.K.S.] up." Furthermore, Detective Miner agreed that R.K.S. was not at the scene where the motor vehicular death occurred.
Detective Elliott journeyed to the District on July 14, 2004, because of a report that two individuals had been detained who were believed to have been involved in a burglary in Pomfret, Maryland. He interviewed T.H. at the Seventh District police station. He read T.H. his rights, which T.H. waived, and then took his statement. The statement was admitted into evidence, as the admission of a party opponent, over the objection of T.H.'s counsel, and the rights card also was admitted. According to the statement, T.H. indicated that he had been in a blue van with his brother, R.K.S., and "two other boys" whom he knew to be from his neighborhood. They drove to a house where they met a white van, which had been stolen. When asked why they "were . . . at the house with two vans," T.H. replied: "I was there because I was at the right place at the wrong time." The vans "were there to try and steal something from the people that lived there . . . . They were trying to steal dirt bikes." When they saw a truck pull up, they drove away and then crashed. They walked around for two or three hours, and his "buddy found a car." His buddy, "D.", had a key to a silver Toyota, and he got into the car. He did not know how his buddy got the key.
Counsel for both T.H. and R.K.S. cross-examined Detective Elliott. Counsel for T.H. focused on the administration of rights, the interaction between the Maryland and the District officers both before and during the interview of T.H., the procedure followed in taking T.H.'s statement, and the substance of that statement. During the interview, T.H. "appeared to be tired," and had "small tears in his eyes" at one point. Counsel for R.K.S. established that Detective Elliott was in the interview room "for a short period[] of time"  "[a]pproximately three minutes"  while Detective Miner was interviewing R.K.S., in order to "see what information was being *207 obtained," and "to see if it was different or the same" as that given by T.H. He noticed at that time that R.K.S. "was upset" and "seemed to be remorseful." He was also crying "at some points," and "looked fatigued, wore out, maybe. Tired, possibly."
Neither R.K.S. nor T.H. presented any testimonial evidence. R.K.S. introduced one exhibit showing "basic information about [his] . . . parents, [and] the time they were notified [about his arrest]." T.H. did not introduce any exhibits, but made a motion for judgment of acquittal on the charges of "UUV passenger and receiving stolen property." R.K.S. joined the motion, which the trial court denied.
In adjudicating both R.K.S. and T.H. as delinquent, based on the charges against them, the trial court stated in full:
Well, the Court has reviewed the evidence in the case, and of course, the Court has looked at each respondent separately. The Court has considered the behavior and the demeanor of the witnesses on the witness stand, the arguments of counsel, and has specifically reviewed Jury Instruction 2.48, Statements of a Defendant, Substantive Evidence.
After a careful review of these things, the Court is satisfied that the Government has demonstrated each and every element of the offenses of UUV passenger and receiving stolen property. The Court believes that the evidence demonstrates beyond a reasonable doubt that both [R.K.S.] and [T.H.] had actual knowledge of the car . . . stolen  depicted in Government's Exhibit Number 1.
But specifically with [T.H.], the Court does infer from the totality of the circumstances as well as his statement that his buddy found the car, and [T.H.'s] actions as described by the state trooper during the trooper's testimony that [T.H.] had actual knowledge that the car was stolen.
With respect to [R.K.S.], the Court looks to his actual statement given at the time of his arrest that he knew the car was stolen. So for those reasons, the Court will adjudicate both respondents involved [as] to each offense.

ANALYSIS

Ineffective Assistance of Counsel
R.K.S. contends that he was denied the effective assistance of counsel when his counsel "`declined' to bring her skill and knowledge to her client's aid for most of the trial." He claims that the trial court "created one financial conflict of interest (the obligation to pay for cross[-]examination) and denied counsel's motion to withdraw." In addition, he maintains that his counsel "had other conflicts of interest with her client." Specifically, his counsel "had a pecuniary interest, identified by the court, of potential civil liability to her client and she had a professional interest in protecting her career given the court's finding that her actions were unethical and subject to referrals to Bar Counsel and a court Order to Show Cause." Furthermore, R.K.S. asserts that "he was compelled to proceed [to trial] although his counsel was unprepared."
The District states that "[t]his [c]ourt should not hear R.K.S.' claim of ineffective assistance of counsel in this direct appeal where there was no collateral attack in the trial court pursuant to . . . Super. Ct. Juv. R. 33."[6] The District relies *208 on our decision in In re E.G.C., 373 A.2d 903, 905 (D.C.1977), but that decision does not support the District's position; and nothing in the plain words of Rule 33 requires a respondent to file a motion for a new factfinding hearing or for a new trial in order to raise a claim of ineffective assistance of counsel, as the District claims.[7] Nevertheless, as we have stated previously, "in the overwhelming majority of cases, it is inappropriate to raise the issue of ineffective assistance of counsel on direct appeal. Attempts to do so are rarely if ever successful." Johnson v. United States, 883 A.2d 135, 145 (D.C.2005) (quoting Simpson v. United States, 576 A.2d 1336, 1338-1339 (D.C.1990) (internal quotation marks and other citation omitted)). We explained the rationale for this general requirement in Mack v. United States, 570 A.2d 777 (D.C.1990):
If [appellant] had filed a motion pursuant to [D.C.Code] § 23-110, then the [AAG] would have had the opportunity to call [appellant's] counsel as a witness in support of his contention that counsel made a reasonable tactical choice [with respect to her strategy]. The government ought not to be deprived of this opportunity simply because [appellant] has elected to rely solely on the trial record. We should not decide the question of ineffective assistance of counsel on the basis of incomplete information because the [appellant] has elected to ground his motion on a truncated record, when the [AAG] has had no opportunity to submit evidence that defense counsel's decisions were based on tactical considerations.
Id. at 786 (footnote omitted).
Even though we generally require a separate motion to be filed in order to raise an ineffective assistance of counsel claim, we have recognized exceptions. For example, in Jeffrey v. United States, 892 A.2d 1122 (D.C.2006), we declared: "While the appellant could not bring his § 23-110 claim in the Superior Court because he did not meet the custody requirement under the statute, this court is not precluded from reviewing the appellant's ineffective assistance claim as part of a direct appeal, so long as that review is confined to the record." Id. at 1126 (citing Mack, supra, 570 A.2d at 785-86). Here, based upon the record before us, it is undeniable that the issue of ineffective assistance of counsel *209 was raised and addressed in the trial court. Indeed, both the trial judge and R.K.S.' mother expressed concern about his legal representation, and that issue overshadowed R.K.S.' trial for one full day. The record for that day and the following is replete with details regarding the representation issue. And the District makes no assertion on appeal that it was deprived of an opportunity to question R.K.S.' counsel about her trial tactics because no separate motion relating to ineffective assistance of counsel was filed. In the peculiar circumstances of this case, where the record contains extensive details about the actions of R.K.S.' counsel and her responses to the inquiries and warnings of the trial judge, calling defense counsel for the purpose of asking her to explain her actions and trial tactics was unnecessary. In short, the District was not prejudiced by the absence of a separate motion in the trial court alleging ineffective assistance of counsel. Therefore, we turn now to the merits of R.K.S.' ineffective assistance of counsel claim.
In its brief, the District contends that R.K.S. has not met the requirement of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), that he show that counsel's performance was "(1) deficient and (2) that the errors made by counsel were so serious that they deprived him of a fair trial." Strickland requires that an appellant "show (1) deficient performance by his trial counsel, and (2) prejudice traceable to his trial counsel's deficiencies." Zanders v. United States, 678 A.2d 556, 569 (D.C.1996). This "burden is a heavy one because of a strong presumption that defense counsel has rendered reasonable professional assistance." Id. (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (other citation omitted)). To satisfy the first Strickland prong, R.K.S. "must show that his `counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" Zanders, 678 A.2d at 569 (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052) (other internal quotation marks omitted). And, "to prove prejudice [R.K.S.] `must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Zanders, 678 A.2d at 569 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
Juveniles subjected to criminal charges that may result in an adjudication of guilt and placement in an institution for a period of time have a due process right to counsel. See In re A.L.M., 631 A.2d 894, 898 (D.C.1993) ("[J]uvenile respondents have a right to counsel based on the due process protection afforded by the Fifth Amendment [to the Constitution of the United States].") (citing In re Gault, 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). As the Supreme Court declared in Gault, supra:
A proceeding where the issue is whether the child will be found to be "delinquent" and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution. The juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it. The child "requires the guiding hand of counsel at every step in the proceedings against him."
In re Gault, supra at 36, 87 S.Ct. 1428 (footnotes omitted). Given the serious situation confronting the juvenile when he or she must answer to criminal charges, the Supreme Court held "that the assistance of counsel is essential . . . for the determination *210 of delinquency, carrying with it the awesome prospect[8] of incarceration in a state institution until the juvenile reaches the age of 21." Id. at 36-37, 87 S.Ct. 1428 (footnote omitted). In addition to a constitutional due process right to counsel, a juvenile in the District has a statutory right to counsel under D.C.Code § 16-2394(a) (2001).[9] And, by rule, the juvenile also is entitled to counsel. See Super. Ct. Juv. R. 44.
We begin with the factual context for our consideration of R.K.S.' argument that the trial court did not fulfill its obligation to ensure that he had the effective assistance of counsel. On Thursday, August 19, 2004, the first day of trial for R.K.S. and T.H., the trial court asked whether government and defense counsel were prepared for trial. Counsel for R.K.S. responded in the negative. When the trial court asked why she was not prepared to go forward, counsel stated, in part:
There are several reasons: First of all, Your Honor, I was presented initially with a discovery packet that did not indicate that there were pictures available that were . . . clearly related to this charge. The [AAG] handed me pictures this morning . . .  about 15, 20 minutes ago . . . .
That's the minimal  the primary concern, Your Honor, is that I have learned that my client has counsel that's proceeding on his behalf in Maryland. I have attempted to talk to his counsel prior to today to determine . . . what strategies and what should be done in this particular jurisdiction that will affect the jurisdiction of his case in Maryland.
As the Court knows, . . . the children are being charged with felony murder in Maryland, which is a very serious charge, and quite different from what is being charged here in the District of Columbia . . . .
Maryland counsel was on vacation and not scheduled to return until Monday. Counsel indicated that she was in her office until "late trying to get case law," but "still did not know how to present, in terms of a trial strategy . . . ." When counsel reiterated that she was "not prepared to go forward this morning," and added that she "was under the impression this matter would be continued . . .," the following exchange took place between counsel and the trial judge:
THE COURT: Why did you think that?
COUNSEL: Well, because all the parties were  there was no opposition to the continuance . . .  we were all under the same impressions, as of yesterday, that this matter was not going to go forward.

*211 ....
THE COURT: You just assumed it was going to be granted?
COUNSEL: Well, Your Honor, quite frankly, yes, because it was a consent motion, and I thought that was usually how it
THE COURT: But there was one person's consent you did not have .... That would be me.
....
COUNSEL: I understand.
THE COURT: The request is denied....
The trial judge took the position that Maryland counsel would "have to confer with [District counsel], because you're going first." Counsel asked the court to "[p]lease note my objection for the record," to which the judge responded: "Okay. Yes, ma'am." After the judge announced her decision to proceed with trial and following a two-hour recess, the trial court twice asked counsel for R.K.S. whether she was "ready to go [move] forward?" Counsel's first response was: "No, Your Honor." Her second response was more emphatic and defiant:
Your Honor, at this point I will raise my client'she won't participate in this trial this morning. I relayed to the Court that he's not prepared to go forward onI am not prepared to go forward on his behalf. We will be sitting in the courtroom and the proceedings will go on if the Court so desires, but we will not be participating in this trial this morning, Your Honor.
The court replied:
I think that's a decision that you make professionally on your own, [Counsel].
....
You filed a motion to continuethat request was denied. The Court found that your grounds were insufficient to support a continuance.
Sitting at the table silentI don't know what the implications arethat's for you, but okay.
From that point on, counsel for R.K.S. continued to maintain that she was not participating, while the trial court first took no issue, and then sought, at times, to suggest for the record that counsel was participating. When asked whether she wished to make an opening statement, counsel answered: "No, we're not participating," to which the court replied: "Okay." The trial court asked counsel if she had any objection to the admission of a government exhibit showing the "VIN" number for Ms. Fick's car. Counsel stated, "I take no position, Your Honor," to which the court replied: "All right." Counsel declined to cross-examine Ms. Fick, and the court made no comment. During the testimony of Trooper Thomas, government counsel asked him a question about an exhibit showing the "VIN" number of Ms. Fick's car. The trial judge indicated that the exhibit should be shown to counsel for R.K.S., and then said: "The record will reflect that [Counsel] looked at it." With respect to cross-examination of Trooper Thomas, counsel declared: "Your Honor, again, if you would note my continuing objection to the Court asking us to proceed in this matter. Therefore, I have no questions." The judge responded: "Okay." After presenting the testimony of Trooper Thomas, the AAG called Detective Miner to the stand. Detective Miner took the statement of R.K.S. The AAG informed the court that he wanted Detective Miner to read R.K.S.' statement into the record, and added: "For the record, since [counsel for R.K.S.] is not participating, I would like to point out ... that this is a statement that is admissible because it is a declaration against interest in this matter." The trial judge interjected:

*212 Well, let me just say two things: One, [Counsel] is participating; the record will reflect she's simply chosen not to cross[-]examine, not to give an opening statement, because her motion [for a continuance] was denied. The position that she is taking during this trial, in my own opinion, is an issue that she'll have with [B]ar [C]ounsel because the motion was denied.
Do you wish to object for the record in terms of the reading of the statement?
Counsel stated: "I'm not participating in this for the record." The judge said: "Yes, ma'am. Okay. You may read it." At the conclusion of the reading of R.K.S.' statement, the government moved the court to admit both the Miranda rights card and the statement. Counsel proclaimed: "I have no position, Your Honor." And, when asked if she had any cross-examination of Detective Miner, counsel said: "No, Your Honor. I'm not participating." Detective Miner was brought back to the stand by the AAG for a few questions relating to the identification of R.K.S., after which government counsel "ask[ed] that the record reflect [Detective Miner has] identified Mr. R.K.S." The trial court wanted to know whether counsel for R.K.S. had any objection. Counsel replied: "I'm not participating, Your Honor, so therefore, I'm not making a statement as an attorneyI'm objecting." The court declared: "Okay. All right, the record will so reflect."
At this point, the trial judge decided to call R.K.S. and his counsel to the bench, perhaps prompted by a note to the courtroom clerk from R.K.S.' mother expressing concern about the way her son's case was being handled. The court inquired whether counsel's behavior constituted "a strategy" and if so, whether it was discussed with R.K.S. Counsel said, "Yes, Your Honor, it is a strategy that I have discussed with my client." She again explained that she had been unable to contact R.K.S.' Maryland counsel and because of the Maryland felony murder issue, suggested that she did not have a trial strategy:
It was my advice to my client that because I am not prepared to go forward today with any position ... that I felt it was in his best interest to allow me to not participate today, and that is why I am not participating.
Again, Your Honor, I also am concerned about the fact thatalthough I didn't make this record clear initiallyI have been in trial with this court this week ... I was in court in almost five matters in this court today, I've been in trial almost every day this week and last week. I have been to see my client, I've made attempts to prepare, but I do not feel like I was able to totally prepare. And ... I believed that because it was a joint request to continuenot a motion, but a joint request to continue this matterthat that ... would have happened today.
. . . I should not have presumed that it was not going to go forward, but I did; and I did not get a call until late, late, late, late, late last night saying that this Court was unable to reach me for whatever reason. . . .
Again, I just felt like in my client's best interests, had I gone forward today, his rights would have been eroded and adversely affected, not only in this proceeding, but also in the proceeding that will take place in Maryland.
The trial court expressed concern about counsel's professionalism, and indicated that her written request for a continuance simply stated that she "had some hearing on the 25th." The court also informed counsel that there is a difference between stating, "I have no opposition, I take no *213 position" and saying, "I'm not participating in this proceeding." The judge continued:
I never did defense workbut in my humble opinion, I can foresee a scenarioand I'm not passing judgment on the merits of this case at this pointwhere he's adjudicated here, committed here, and walks in Maryland. It falls in your lap, and I am just concerned about that scenario.
You never told the Court that you didn't have an opportunity to prepare. You were in the courtroom when we set this date. All of us were on the same page. All of us believed that both of these young men would be in the state of Maryland, and your request for a continuance just said there was a hearing coming up on the 25th, and let's just wait that out. I am just concerned about the record in this case . . . .
The trial judge addressed R.K.S.:
Mr. S., as I take it, you have instructed your lawyer to utter the words, I am not participating in this hearing? You've told your lawyer to say that?
R.K.S. answered: "Yes." The judge again asked: "You've told your lawyer to say thatin this case?" R.K.S. responded:
She was explaining to me that she wasn't ready for this case, and I was telling her if she's not ready, I'm not going to be for it either. She was telling me that she don't got (sic) enough stuff for the case, and I was telling her if she ain't ready, I ain't ready. She said she ain't ready, so I was telling her I wasn't ready.
The judge declared:
All right. It will just play out the way it has to play out then. Okay.
[Counsel], I'm just very concerned. I've been on the bench 14 years; I've never referred a lawyer to [B]ar [C]ounsel. Never ever ever. I'm not saying I'm doing it here; I'm just concerned about howI have just never participated in a proceeding where a lawyer has said, I'm not participating. I'm just concerned. That's all.
So the record is made . . . .
Then, when the bench conference terminated, the trial judge advised that other juvenile matters would be called, and the family of R.K.S. and T.H. would "have [to] step out." Apparently without calling R.K.S.' mother to the bench, the judge said: "Mom, I got the question from you and we're trying to deal with it overnight. Okay?" R.K.S.' mother replied: "Okay."
The next morning, the trial judge decided to give an ultimatum to R.K.S.' counselparticipate as counsel and pay for the return of government witnesses so that cross-examination could take place, or face a show cause order as to why she should not be held in contempt:
Well, [Counsel], the Court, as you know, was very, very troubled by the position that you took yesterday. And I have to say I was stunned, because I had never been confronted with a lawyer who basically defied a court order to proceed.
I think that the position you put me in is to issue a show cause for contempt for you. I think that you have deliberately abandoned your ethical obligation representing Mr. S.
It's the Court's view, [Counsel], that there is a forum to litigate whether or not you believe this Court abused its discretion in denying a request for a continuance. To say to a judge, a court, hey, I'm not participating in this, is not the legal avenue that one takes to challenge an order. You get to do that in the Court of Appeals if there is an adjudication.
So we really have two choices here, [Counsel]. I will order the Government *214 to get back the witnesses from Monday morning at your personal expense meaning, transportation and pay them for the day that they've lost at work for Mondayand we proceed in the trial, because I am ordering you to participate at this point; or, I have your show cause order here and we try your case on Monday with your lawyer. Those are your two options.
When counsel asked permission to offer an explanation to the court, the trial judge stated emphatically:
You cannot explain. It's either yes, Judge, I will pay for the witnesses to come back; or I sever Mr. S. out and we try your case on Monday. There is nothing to explain. You'll have your day in court to explain.
This is very serious, [Counsel], I stopped short ofI really was stunned. I have been in Superior Court since 1980. I've clerked at the Court of Appeals for a year, I was in the U.S. Attorney's office for nine years, and I've been on the bench 14 years. I have never seen an attorney do what you did yesterday, which is, I'm not in this, at the expense of their client.
You still had an ethical obligation to proceed the best way you could, and you just take me up to the Court of Appeals, and they have the final say on that. But you cannot stand before a judge and say, I'm not in this.
So you either participate from this point on or we try your case on Monday. Those are your two choices.
I [genuinely] do not want to do this. You could tell yesterday I was trying to get you to participate in the trial. Your behavior was so reprehensible yesterday that even Mr. S.'s mother approached the courtroom clerk about what you were doing to her son, and she put it in writing for me. That was 3:30 yesterday afternoon. I will take part in responsibility, [Counsel], for not stepping in sooner, but I generally was stunned by your behavior.
As I indicated yesterday, I have never referred an attorney to [B]ar [C]ounsel, and my colleagues are telling me that I must refer you because of your behavior before the Court yesterday. I am also told I need to inform the CCAN Bar for your complete failure to represent your client yesterday. I have never done that to an attorney before.
On this record, [Counsel], on this record, I don't have the reputation of acting out of ego. So no one who sees this record will believe that I was mad at you and proceeded in this fashion.
But you've left this Court no choice. You either participate now, get your checkbook out, and pay the [AAG] s to get the witnesses back here for Monday, or we try your contempt trial Monday afternoon. Those are your choices.
In response to counsel's request for "time to think about" the trial court's ultimatum, the judge granted her "five minutes." And, in reply to counsel's assertion that, "my client's mother wants to address the Court," the judge stated: "We'll deal with your issue first."
After the short recess, counsel for R.K.S. "apologize[d] to the Court" and attempted to further explain her behavior. The judge interrupted to say that counsel would have her day in court if she did not proceed with the trial, and that the trial court was not "accusing [her] of bad faith" or "being malicious," or "being disrespectful to the Court." Rather, the judge "believe[d] that [Counsel had] an honest misbelief or mistaken belief that [she could] do that." Moreover, the trial judge concluded that R.K.S. had not instructed counsel to act as she did:

*215 [T]his involves a young man who has a right to have his lawyer represent him in this courtroom. This isn't about me; this is about his right to have a lawyer here working for him. And when he came to the bench yesterday, he didn't tell me what you said. He said, well, she told me she wasn't ready, so I guess I'm not ready. That's what he said.
Had he said, I instructed her to tell you we're not participating, that would have taken us in a whole different ball game, because you would have been acting on the advice of your client. But he told you something totally different from that. So we have to proceed.
Defense counsel again made an effort to explain her actions, finally saying: "Your Honor, my thought was that if [R.K.S.] would exercise his right to go to trial in this matter versus accepting responsibility for his actions, that would be used against him in Maryland." The exchange between counsel and the trial judge continued as they reviewed what had transpired, and whether counsel's behavior constituted "a trial strategy" from the outset of the trial, or was articulated as such much later in the proceedings. After again being told that the trial would move forward, counsel stated: "By order of the Court, I will go forward. I'll explain to my client what that means, but I won't defy the Court's order now; neither can I support the position."
The attention of the trial judge turned to the availability of government witnesses to return for cross-examination by R.K.S.' counsel. The Assistant Attorney General ("AAG") reported that Trooper Thomas might not be available because he was on vacation, that he did not have Ms. Fick's telephone number at the court, but that Detective Miner would be available to return on Monday. The trial judge advised counsel for R.K.S. that she could review the direct testimony transcripts "and decide in fact whether or not [she] want[ed] to cross[-]examine." Counsel expressed doubt that she could "effectively represent [her] client" under those conditions. The trial judge stated: "[Counsel], you haven't effectively represented your client up until this point[.]" Counsel took issue with the judge's statement, asserting, "I don't believe that I did not effectively represent my client," and then moved to withdraw from the case. The judge replied: "No, ma'am. No, ma'am." The AAG deflected the judge's attention by indicating that Detective Elliott was still present in the court.
Counsel for T.H. let it be known to the trial court that if government witnesses were brought back by R.K.S.' counsel, she should have the opportunity to cross-examine them further, as necessary. The trial judge declared that the AAG could stipulate to the fact that Ms. Fick, the owner of the stolen car, did not know R.K.S., had never seen him before, and did not observe him in her kitchen on the day her Camry was stolen. The judge commented that Detective Miner, who "tie[d] R.K.S. in [the crime]" would be available on Monday, and further suggested that Trooper Thomas was not a key witness for the government.
After more discussion, the case continued with the interrupted cross-examination of Detective Elliott by T.H.'s counsel. During that cross-examination, counsel for R.K.S. asked for "[t]he Court's indulgence." The record reflects a pause in the proceedings and a "[b]ench conference with [counsel for R.K.S.] only,"[10] before *216 T.H. concluded his cross-examination. When T.H.'s cross-examination of Detective Elliott was completed, counsel for R.K.S. also cross-examined him.
As the trial judge focused on the Monday schedule, counsel for T.H. announced that she would have one witness for the defense, and counsel for R.K.S. also said "[o]ne" in reply to the judge's question. The AAG volunteered his "understanding. . . that [counsel for R.K.S.] [would not] have the government recall Trooper Thomas, and [would not] have the government recall Ms. Fick" in light of the proposed stipulation regarding her testimony. Counsel for R.K.S. made no immediate response to the AAG's understanding, but discussed her desire to review the transcript of the proceedings. Part of the discussion of this matter was "off-record," and apparently related to technical difficulties with the review of the transcript. Eventually, counsel for R.K.S. indicated that she would request the return only of Detective Miner. Ultimately, counsel for T.H. and R.K.S. decided not to present any defense witnesses.
These extensive excerpts from the record reveal that as the trial unfolded during the presentation of the government's witnesses, R.K.S. had absolutely no representation of counsel in the adversarial process, despite his undeniable constitutional due process right to counsel under Gault, supra, 387 U.S. at 41, 87 S.Ct. 1428, and A.L.M., supra, 631 A.2d at 898, his statutory right mandated by D.C.Code § 16-2394(a), and his unequivocal entitlement to counsel found in Super. Ct. Juv. R. 44. In a Sixth Amendment setting, where there has been a complete denial of counsel, or where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," there is a presumption of ineffective assistance of counsel. United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); see also Walker v. Maryland, 391 Md. 233, 892 A.2d 547, 554-55 (2006). While we are not faced with a Sixth Amendment issue in this juvenile proceeding, R.K.S. essentially had no counsel during the first part of his trial. Although counsel was physically present while the government's witnesses testified, she "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," and a presumption of ineffective assistance of counsel is appropriate. Cronic, 466 U.S. at 659, 104 S.Ct. 2039. As we show later in our analysis, on the peculiar facts of this case, that presumption was not overcome by the remedial measures taken by the trial court to ensure representation for R.K.S. We do not discount the possibility, however, that this trial might have been saved, even though the court intervened very late in the proceedings. We conclude that, considering all the circumstances of this case, the remedial measures employed did not achieve that goal.
Here, instead of focusing immediately upon fourteen-year-old R.K.S.' right to counsel, for one complete day the trial court and counsel were mired in a test of wills. Undoubtedly, the trial judge was "stunned" by counsel's articulated position, as she indicated, and the judge may have initially thought that counsel's statements *217 of non-participation reflected a defense strategy. But the judge's inquiry was late under the circumstances of this case as a petulant defense counsel alternated between saying, "We're not participating," or "I'm not participating," and "I have no position" or "I'm not making a statement as an attorneyI'm objecting"while R.K.S. remained without the constitutionally and statutorily mandated assistance of counsel.
By the second day of the trial, the judge was prepared to take firm action, and commendably, accepted responsibility for part of the situation. But by then, it was arguably too late to remedy the situation. Under Cronic, supra, it is appropriate to invoke the presumption of ineffective assistance of counsel on the first day of R.K.S.' trial. Indeed, R.K.S. had no assistance of counsel on the first day of his trial, and had not, nor could this 14-year old respondent validly have approved a trial strategy of non-participation or silence. And, the trial court's determined efforts to correct the situation on the second day of trial (1) by convincing R.K.S.' counsel to perform as the effective counsel to which he was entitled under due process principles and under the District's statute, and (2) by providing an opportunity for cross-examination of the government's witnesses, fell short of the mark as remedial measures. Trooper Thomas who identified R.K.S. as one of the passengers in the stolen Camry that he chased into the District was not brought back for cross-examination, and there is no explanation as to why R.K.S.' counsel decided not to recall him. Moreover, R.K.S.' statement to Detective Miner already had been introduced into evidence, with his counsel stating "no position" on its admission. In short, looking at this record, we cannot say that counsel's non-participation on the first day of R.K.S.' trial did not "lead ... to an apparently unjust verdict," Thomas v. United States, 772 A.2d 818, 821 (D.C.2001); nor are we satisfied that the trial court adequately safeguarded R.K.S.' statutory right "to counsel at all critical stages of proceedings before the Family Division of the Superior Court," A.L.M., supra, 631 A.2d at 898, or that R.K.S.' counsel met "[t]he first essential element of effective assistance of counsel," that is, that, under the circumstances presented here, she had the "ability and willingness to advocate fearlessly and effectively on behalf of [her] client," Douglas v. United States, 488 A.2d 121, 135-36 (D.C.1985) (citations and internal quotation marks omitted). Consequently, we hold that R.K.S. is entitled to a new trial.

Sufficiency of the Evidence
We now turn to the sufficiency of the evidence in order to determine whether the government may retry R.K.S. on one or both charges.[11] R.K.S. and T.H. essentially contend that the government failed to satisfy its evidentiary burden on both the UUV and RSP charges. On the UUV conviction, the District argues that under "the totality of surrounding circumstances," R.K.S. and T.H. had actual knowledge that the Camry was stolen, and exhibited consciousness of guilt when they fled the Camry after it crashed; and they did not have the consent of the owner of the Camry to use the car. The District further argues that the elements of RSP were met with respect to R.K.S. because he "knew the car was stolen and was using the vehicle to return home." The District maintains that the evidence was sufficient as to T.H. on the RSP charge, because he *218 "fled from the police and admitted that he knew his friend had `found' the vehicle."
We review the evidence "in the light most favorable to the government and give deference to the right of the [fact finder] to weigh the evidence, determine the credibility of the witnesses, and draw all justifiable inferences of fact, making no distinction between direct and circumstantial evidence." Earle v. United States, 612 A.2d 1258, 1265 (D.C.1992). "Reversal is warranted only if there is no evidence whatever upon which a reasonable trier of fact might fairly find guilt beyond a reasonable doubt." Johnson v. United States, 820 A.2d 551, 560 (D.C.2003) (citations omitted). Put another way, "[a] court must deem the proof of guilt sufficient if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Smith v. United States, 899 A.2d 119, 121 (D.C.2006) (citations and internal quotation marks omitted) (emphasis in original).
To prove UUV, the government must establish beyond a reasonable doubt:
(1) that appellant took a motor vehicle, or that []he used, operated, or removed it from any place, or that []he caused it to be taken, used, operated, or removed from any place; (2) that []he operated it, or drove it, or caused it to be operated or driven for h[is] own profit, use or purpose; (3) that []he did so without the consent of the owner or some other person empowered to consent on the owner's behalf; and (4) that at the time the appellant took, used, operated, or removed the vehicle, or caused it to be taken, used, operated, or removed, []he knew that []he did so without the consent of the owner or some other authorized person.
Agnew v. United States, 813 A.2d 192, 196-97 (D.C.2002); see also D.C.Code § 22-3215; In re C.A.P., 633 A.2d 787, 792 (D.C.1993) ("In order to convict a passenger of UUV, the government must show, beyond a reasonable doubt, that the passenger was present in the vehicle with knowledge that the vehicle was being operated without the owner's consent."); In re T.T.B., 333 A.2d 671, 673 (D.C.1975) ("To sustain a conviction of a passenger in a stolen vehicle of its unauthorized use, the government must show beyond a reasonable doubt that the passenger rode in the vehicle knowing that it was being used without the consent of the owner; that is, that the accused had actual knowledge of the criminal act being committed) (citations omitted). Trooper Thomas testified at trial that he pursued the stolen Camry from Maryland into the District of Columbia, and that he could see both R.K.S. and T.H. looking back toward his vehicle. After the vehicle crashed, appellants fled on foot. He made an in-court and an out-of-court identification of both appellants, and was one hundred percent certain of his identification. The evidence presented by the government established directly and by reasonable inference that both appellants knew that the Camry was stolen. Moreover, their flight after the vehicle crashed shows their consciousness of guilt. See T.T.B., supra, 333 A.2d at 673. Consequently, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime [UUV] beyond a reasonable doubt." Smith, supra, 899 A.2d at 121 (citation omitted and internal quotation marks omitted) (emphasis in original). Thus, we cannot sustain the challenge to the sufficiency of the evidence concerning the UUV conviction. Therefore, R.K.S. may be retried on that *219 charge.[12]
To prove felony RSP, the government must show beyond a reasonable doubt that:
(1) the property in question was stolen by someone; (2) appellant received, possessed or obtained control of the property in question; (3) at the time appellant received, possessed or obtained control over the property, he knew or had reason to believe that the property was stolen; (4) at the time appellant so acted, he had the intent to deprive another of the right to the property or to a benefit of the property; (5) at the time appellant acted, he intended to disobey the law or acted in conscious disregard of the law; and (6) the property had a value of $250 or more.
Moore v. United States, 757 A.2d 78, 82 (D.C.2000) (citations omitted); see also D.C.Code § 22-3232(a) and (c)(1). The trial court declared "that the Government has demonstrated each and every element of the offense[] of ... receiving stolen property." However, the only element that the court mentioned was "actual knowledge" that the car was stolen. The court does not explain how the second element of the offense is metthat R.K.S. and T.H., who were passengers in the stolen Camry, "received, possessed or obtained control of the [Camry]." Moore, supra, 757 A.2d at 82. Our limited case law concerning RSP does not illuminate the factors that will satisfy the receipt, possession or control element of RSP.
Other jurisdictions, however, have broached this matter, and we are able to distill legal principles articulated in several cases. Two common principles regarding possession in a RSP case are that: (1) "A person's presence in a vehicle as a passenger, without more, is insufficient to prove that he possessed the vehicle"; and (2) "To establish possession, the prosecution must show that the defendant exercised `dominion and control' over the automobile." Massachusetts v. Darnell D., 445 Mass. 670, 840 N.E.2d 33, 36 (2005) (citations omitted). See also New Jersey v. McCoy, 116 N.J. 293, 561 A.2d 582, 586 (1989) ("A defendant's mere presence in or near a stolen vehicle will not create an inference of possession if there is no other evidence to establish a connection between the defendant and the vehicle."); New York v. Rivera, 82 N.Y.2d 695, 601 N.Y.S.2d 470, 619 N.E.2d 407, 408 (1993) ("[D]efendant's presence in the car cannot be equated with possession"; to possess means "having physical possession or otherwise to exercise dominion and control over tangible property.") (citation and internal quotation marks omitted); California v. Land, 30 Cal.App.4th 220, 35 Cal.Rptr.2d 544, 548 (1994) ("[D]ominion and control are essentials of possession, and they cannot be inferred from mere presence or access."). At least one jurisdiction has rejected the notion that flight, exhibiting consciousness of guilt, is sufficient to demonstrate possession or control: "[A] conviction [on a RSP charge] may not be based on consciousness of guilt alone." Darnell D., supra, 840 N.E.2d at 36 (citations omitted).
What constitutes "dominion and control" over the vehicle generally depends upon the facts and circumstances of each case. As the court said in Land, supra, "there is no single factor or specific combination of factors which unerringly points to possession of the stolen vehicle by a passenger. If anything, [pertinent cases] emphasize the question of possession *220 turns on the unique factual circumstances of each case." 35 Cal.Rptr.2d at 549. Or, as the court in McCoy, supra, declared: "A defendant's words or conduct, as well as other evidence, may sufficiently substantiate his or her relationship to the stolen property to support an inference of possession." 561 A.2d at 587.
Our examination of the unique factual circumstances of R.K.S.' and T.H.'s cases reveals factors from which a reasonable trier of fact could determine, or infer, that T.H. "possessed" the stolen Camry for his own benefit; and that (subject to any defense of duress) R.K.S. also "possessed" the stolen Camry for his benefit. According to R.K.S.' statement to Detective Miner, R.K.S. and T.H. called M. on the morning of July 14, and M. and his friend picked the brothers up in M.'s sister's Nissan. T.H. told Detective Elliott that M. and his friend were from "the neighborhood." Although R.K.S. told Detective Miner (perhaps for a self-serving purpose) that he did not want to go to Charles County but was instructed to "shut up, [and to] stop acting like a little b* * *h [on pain of being slapped]," he remained in the van while M. drove the blue Nissan van to Charles County. There the blue van passengers met M.'s friend who was driving a white windowless van. T.H. said the white van had been stolen. According to R.K.S., M. stated he was "going to get my bike." In his statement to Detective Elliott, T.H. declared they "were [at a house in Charles County] to try and steal something from the people who live there.... They were trying to steal dirt bikes." M. directed R.K.S. to "watch out for [him]" and warned R.K.S. that if he (M.) got caught, he would "f* *k [R.K.S.] up." The plan to steal dirt bikes was interrupted when a truck pulled up. The vans drove away and the blue van, in which R.K.S. and T.H. were riding, crashed. T.H. reported that he and the others who had been in the blue van walked around for two or three hours until his "buddy found a car." R.K.S. and T.H. got into the stolen Camry, and used it to return to the District.
While mere presence in the stolen Camry is not enough to establish "possession," Land, supra, 35 Cal.Rptr.2d at 548; Rivera, supra, 601 N.Y.S.2d 470, 619 N.E.2d at 408; McCoy, supra, 561 A.2d at 586, the summary of testimony in this case, set forth above, is sufficient for a reasonable trier of fact to infer "possession" of the stolen Camry by R.K.S. (subject to any defense of duress), and T.H., as well as their intent to use the Camry for their own benefit, that is, to return to the District after walking around for two or three hours in search of transportation home. In addition, the record shows, as the trial judge found, that both R.K.S. and T.H. knew that the Camry was stolen, see McCoy, supra, "conclud[ing] that an inference of possession may arise from a passenger's presence in a stolen automobile when that presence is coupled with additional evidence that the passenger knew the driver, knew that the vehicle was stolen, and intended to use the vehicle for his or her own benefit and enjoyment," Id. at 588. In short, read in the light most favorable to the government, Earle, supra, 612 A.2d at 1265, the evidence was sufficient for a reasonable trier of fact to conclude that the District had proved its case against T.H. on the RSP charge beyond a reasonable doubt, and that the District had done the same as to R.K.S., subject in his case to any defense of duress.[13]
*221 Accordingly, for the foregoing reasons, we reverse R.K.S.' convictions in this matter, and remand his case to the trial court for a new trial on the UUV and RSP charges.
So ordered.
NOTES
[*] Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.
[1] We affirm T.H.'s conviction on the UUV and RSP charges.
[2] On the morning of July 14, 2004, Detective Miner heard "a lookout for two vehicles. One had wrecked and four individuals had fled out of that van, and a separate van continued on its way and eventually struck head-on with a citizen, killing her."
[3] When the government moved for the admission of the rights card which Detective Miner read to R.K.S., and R.K.S.' statement, counsel for R.K.S. told the trial judge: "I have no position, Your Honor." The trial judge admitted both documents into evidence.
[4] R.K.S. indicated that M. "said sit in the car. Tell me if someone is coming. If I get caught, Im going to f* *k you up. Watch out for me."
[5] R.K.S. claimed that the money recovered from his pocket was a birthday gift from his mother, that he sat "in the van minding [his] own [business]," and that nothing had been stolen from the house.
[6] Super. Ct. Juv. R. 33 provides as follows:

The judicial officer on motion of a respondent may grant a new factfinding hearing to the respondent if required in the interest of justice. On motion of a respondent for a new factfinding hearing, the judicial officer may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new factfinding hearing based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment, but if an appeal is pending the judicial officer may grant the motion only on remand of the case. A motion for a new factfinding hearing based on any other grounds shall be made within 7 days after a finding of guilty or need of supervision or within such further time as the judicial officer may fix during the 7-day period.
[7] In E.G.C., supra, some seven months after his adjudication on criminal charges, the appellant filed a motion for a new trial based on newly discovered evidence, while his direct appeal was pending in this court. Rule 33 specifically provides that: "A motion for a new factfinding hearing based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment . . . ." The appellant's alleged newly discovered evidence in E.G.C., supra, was the ineffective assistance of his counsel. There was no mention during his trial of ineffective assistance of counsel, 373 A.2d at 905. After his Rule 33 motion was denied, the appellant failed to file a notice of appeal relating to the Rule 33 decision. Consequently, "[s]ince the ineffectiveness issue was not raised in the Juvenile Branch until the motion for a new fact-finding hearing was filed, we h[e]ld that appellant's failure to file a notice of appeal within 10 days from the denial of that motion preclude[d] us from reaching the ineffective assistance issue." Id. at 905 (footnote omitted).
[8] Super. Ct. Juv. R. 44(a) states in pertinent part:

In delinquency . . . cases, the respondent shall be represented by counsel at all judicial hearings including . . . the pretrial conference, the factfinding hearing, the disposition hearing, and hearings for the review of a dispositional order. If counsel is not retained for the respondent or if it does not appear that counsel will be retained, counsel shall be appointed . . . for the respondent . . . .
[9] D.C.Code § 16-2304(a) provides that:

A child alleged to be delinquent or in need of supervision is entitled to be represented by counsel at all critical stages of [Family] Division proceedings, including the time of admission or denial of allegations in the petition and all subsequent stages. If the child and his parent, guardian, or custodian are financially unable to obtain adequate representation, the child shall be entitled to have counsel appointed for him in accordance with rules established by the Superior Court. In its discretion, the Division may appoint counsel for the child over the objection of the child, his parent, guardian, or other custodian.
[10] The full exchange between counsel and the trial judge appears not to be included in the record. Apparently counsel was experiencing some distress as the result of the trial judge's ultimatum. The record reflects only the following statement by the trial judge:

I know. Come here. Put your hand up here. I understand, ma'am. I understand what you're going through. I do. This is something that I did not want to do, [Counsel], but I believe I was required to do it.
I'm just trying to get through this witness's testimony so he doesn't have to come back, and then I'll give you a break. Okay. I'm just trying to cut down on the inconvenience to him; okay? And then I'll give you a break. Okay.
The record does not reveal what, if anything, counsel said to the judge.
[11] We also decide the sufficiency issue raised in In re T.H., the companion case decided today.
[12] As we indicated previously, see note 1, supra, we affirm T.H.'s conviction on the UUV charge.
[13] Because of our disposition in R.K.S.' case, we need not consider his other arguments. However, in the companion case of In re T.H., also decided today, we address two other issues raised by R.K.S.: that relating to the trial court's parens patriae obligation, and that concerning the Jencks Act.